**Benny Lee HODGE, Appellant,**

v.

**COMMONWEALTH of Kentucky,
Appellee.**

No. 1996–SC–1085–MR.

Supreme Court of Kentucky.

Feb. 24, 2000.

As Modified on Denial of Rehearing
June 15, 2000.

Marie Allison, John Palombi, Assistant Public Advocates, Frankfort, for appellant.

A.B. Chandler, III, Attorney General, Ian G. Sonego, Assistant Attorney General, Frankfort, for appellee.

COOPER, Justice.

Following a trial by jury in the Laurel Circuit Court in October 1996, Appellant Benny Lee Hodge was convicted of two counts of murder, one count of robbery in the first degree, and one count of burglary in the first degree. He was sentenced to death for each murder conviction and to twenty years each for the robbery and burglary convictions. He appeals to this Court as a matter of right. Ky. Const. § 110(2)(b).

## I. FACTS.

On June 16, 1985, Edwin and Bessie Morris were murdered in their home in Gray Hawk, Jackson County, Kentucky. Edwin Morris's body was found lying on the kitchen floor, gagged, with his hands tied behind his back, and with a pillow near his head. Bessie Morris's body was

found on a bed in the bedroom with her hands tied behind her back and her feet tied together. A pillow was also found near her body. The medical examiner testified that Edwin Morris had been shot twice, once in the forehead and once in the right side of the head, and that either wound would have been fatal. One bullet was recovered from his body; the other had passed through his body. The examiner testified that even if the bullet wounds had not been fatal, Mr. Morris would have suffocated from the gag. Bessie Morris died of two gunshot wounds to the back, both of which were fatal, but death did not immediately result from either. One bullet was recovered from her body and the other had passed through her body.

A ballistics expert testified that one of the two bullets recovered from the victims' bodies was definitely a .38 caliber bullet and the other was either a .38 caliber or a .357 magnum caliber. Both bullets had been fired from the same weapon, which could have been either a .38 caliber or a .357 caliber handgun. Two additional bullets were recovered from the crawl space under the kitchen floor where Edwin Morris's body was found and a third from the box springs of the mattress on the bed where Bessie Morris's body was found. The ballistics expert testified that these were all 9–mm Lugar bullets, which appeared to have been fired from a semi-automatic pistol; and that at least two of the bullets were fired from the same weapon and the third could have been fired from the same weapon. The two pillows found near the bodies contained large holes surrounded by gunshot residue consistent with a bullet being fired through each pillow to muffle the sound.

Appellant was first tried, convicted and sentenced to death for these murders in 1987. The convictions were vacated on a confession of error by the Commonwealth, *i.e.*, that the trial judge had not conducted individual voir dire on the issue of pre-trial publicity. *See Morris v. Commonwealth,* Ky., 766 S.W.2d 58 (1989). Donald Bartley

had been a witness for the Commonwealth at the 1987 trial and a redacted transcript of his testimony was read to the jury at the 1996 trial. According to Bartley, he, Appellant and Roger Epperson went to the Morrises' residence with the intent to commit robbery. Appellant was armed with a .38 caliber handgun and Epperson with a 9–mm pistol. Appellant and Epperson went to the door and were admitted by Mrs. Morris. Bartley stayed outside to keep a lookout, but was able to view some of the proceedings through a patio door. He saw both Appellant and Epperson brandish their weapons, then knock Mr. Morris to the kitchen floor. Bartley then heard shots, following which Appellant and Epperson came out of the house with a sack full of money and their pockets stuffed with more money. A subsequent count revealed they had stolen $35,000.00 in cash from the Morrises. They also stole a diamond cluster ring, a set of diamond earrings, and a .38 caliber handgun. Later, they disassembled the 9–mm pistol, wiped all three handguns clean of fingerprints, and threw them from a bridge into a river in the Daniel Boone National Forest. They then burned Appellant's bloodstained shirt and tennis shoes.

Appellant's former wife, Sherry Hamilton, testified at the 1996 trial that Appellant told her that he and Bartley (not Epperson) had entered the Morrises' residence and that he shot Edwin Morris following a scuffle which ensued when Morris reached for a gun on the refrigerator. Bartley then took Bessie Morris into the bedroom and shot her. When Bartley emerged from the bedroom, Appellant asked him if Mrs. Morris was dead and Bartley replied that he thought she was; whereupon Appellant went into the bedroom and shot Mrs. Morris again to make sure she was dead. Hamilton testified that Appellant usually carried a .38 caliber handgun and that Bartley usually carried a 9–mm handgun. She also testified that Appellant gave her the diamond ring and

earrings and that she subsequently sold them to a "fence" in Tennessee.

## II. VENUE.

Appellant was indicted by a Jackson County grand jury. Prior to his first trial, venue was changed from the Jackson Circuit Court to the Laurel Circuit Court. After his 1987 convictions were vacated and remanded for a new trial, Appellant moved for another change of venue. An evidentiary hearing was held at which Appellant introduced the affidavits of two witnesses and a 1994 "venue survey" prepared by an employee of the Department of Public Advocacy. The survey purported to show that citizens of Laurel County were more familiar with this case than were citizens of Warren County, the venue to which Appellant desired to have his case removed. Although 57% of Laurel County respondents stated they had read, heard or seen something about the Morris murders, only 10% could name Appellant as being one of those charged. Upon being informed that "Benny Hodge had been charged, convicted and sentenced to death on November 7, 1987 for the murders of Edwin and Bessie Morris," only 28% stated that they were aware of that fact and only 20% were aware that the convictions had been reversed for a new trial. Even after being advised of Appellant's prior convictions of these murders, only 29% stated they thought he was guilty.

The Commonwealth presented the testimonies of the County Clerk and the editor of the local newspaper, both of whom testified that they believed Appellant could receive a fair trial in Laurel County. The County Clerk also testified that the county's registered voters had increased approximately one-third since the 1987 trial. After hearing all of this evidence, the trial judge overruled the motion, but stated he was willing to reconsider the issue following voir dire.

There is no statutory entitlement to a second change of venue. KRS 452.240; *Taylor v. Commonwealth*, Ky.,

821 S.W.2d 72 (1990), *cert. denied*, 502 U.S. 1100, 112 S.Ct. 1185, 117 L.Ed.2d 428 (1992), *overruled on other grounds, St. Clair v. Roark*, 10 S.W.3d 482 (Ky. 1999). Furthermore:

> [T]he mere fact that jurors may have heard, talked, or read about a case does not require a change of venue, absent a showing that there is a reasonable likelihood that the accounts or descriptions of the investigation and judicial proceedings have prejudiced the defendant. . . . Prejudice must be shown unless it may be clearly implied in a given case from the totality of the circumstances.

*Montgomery v. Commonwealth*, Ky., 819 S.W.2d 713, 716 (1991); *Brewster v. Commonwealth*, Ky., 568 S.W.2d 232, 235 (1978). "It is not the amount of publicity which determines that venue should be changed; it is whether public opinion is so aroused as to preclude a fair trial." *Kordenbrock v. Commonwealth*, Ky., 700 S.W.2d 384, 387 (1985), *cert. denied*, 476 U.S. 1153, 106 S.Ct. 2260, 90 L.Ed.2d 704 (1986), *habeas granted in part on other grounds, Kordenbrock v. Scroggy*, 919 F.2d 1091 (6th Cir.1990), *cert. denied*, 499 U.S. 970, 111 S.Ct. 1608, 113 L.Ed.2d 669 (1991). A trial judge's decision not to change venue "is given great weight because he is present in the county and presumed to know the situation." *Nickell v. Commonwealth*, Ky., 371 S.W.2d 849, 850 (1963). The fact that a previous trial generated publicity does not automatically require a change of venue for the retrial, particularly when, as here, a substantial passage of time has occurred between the trials. *Patton v. Yount*, 467 U.S. 1025, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984). It is significant that (1) even though Appellant had been previously tried and convicted in the Laurel Circuit Court of the Morrises' murders, only 10% of Laurel County respondents to the "venue survey" initially were aware that Appellant was *accused* of the crimes; and (2) even after being informed of Appellant's previous conviction of the murders, only 29% opined that he

was guilty. We find no error in the trial judge's denial of Appellant's initial motion for a change of venue.

Appellant renewed his motion to change venue on the morning of trial *before* the jury selection process began, but did not renew his motion at the conclusion of voir dire. After excusals for cause, thirty-five potential jurors were selected; and, after the exercise of peremptory strikes, fifteen jurors were seated to try the case. Since a presumptively impartial jury was seated to try Appellant's case, and since Appellant did not renew his motion for change of venue after the jury was selected, the issue becomes whether the trial judge erred in failing to sustain any of Appellant's motions to excuse prospective jurors for cause.

### III. JURY ISSUES.

#### 1. *Motions to Strike for Cause.*

Excluding those excused on motion of the Commonwealth, twenty-eight prospective jurors were excused for cause either *sua sponte* or at Appellant's request. Appellant asserts prejudicial error in the trial judge's failure to excuse eight additional jurors for cause.

■ *Juror No. 56,* a widow, stated that "years and years ago" she and her late husband had read some newspaper articles about these murders and that the articles led them to believe that the persons involved were guilty. However, without any prompting, she added that she was unaware of what evidence was offered at trial and that her opinion might have been different if she had heard the evidence. She had not read any recent articles about the murders and had not seen any television reports about the case. She could not recall Appellant's name being mentioned. She stated that she did not have a present opinion as to Appellant's guilt or innocence and that he was presumed innocent until proven guilty by the evidence.

Although we held in *Marsch v. Commonwealth,* Ky., 743 S.W.2d 830 (1987) that the failure to excuse jurors who had previously expressed opinions was reversible error, we also held in that case that "the formation and expression of [an] earlier opinion may not, standing alone, be sufficient to require disqualification." *Id.* at 833. Juror No. 56 had formed her initial opinion shortly after the murders occurred "years and years ago" as a reaction to newspaper accounts. She recognized the difference between newspaper accounts and trial testimony and expressed her adherence to the presumption of innocence. Juror No. 56 was not rehabilitated by a "magic question," *Montgomery v. Commonwealth, supra,* at 718, but immediately and spontaneously qualified her candid admission of her previously held opinion. As in *Foster v. Commonwealth,* Ky., 827 S.W.2d 670 (1991), *cert. denied,* 506 U.S. 921, 113 S.Ct. 337, 121 L.Ed.2d 254 (1992), even though this juror had previously expressed an opinion of guilt, the trial judge decided that she had put that opinion aside. "Taken in the full context of [her] answers, the trial judge's decision was not erroneous." *Id.* at 675.

■ *Juror No. 1* had moved to Laurel County from North Carolina and knew nothing about the facts of this case. Upon questioning by the trial judge, he stated that he could consider the entire range of penalties and would not automatically exclude either the minimum or the maximum penalties. He also responded affirmatively when asked by defense counsel whether he could consider imposition of the minimum penalty of twenty years upon conviction of intentional murder. However, when asked if he could consider imposition of the minimum penalty as punishment for *two* intentional murders, he stated that he could not do so. When invited by the trial judge to move to excuse Juror No. 1 for cause, defense counsel specifically declined. Nor did Appellant use a peremptory strike to excuse this juror. Juror No. 1 was excused by a peremptory strike by the Commonwealth. Appellant now claims the trial

judge committed reversible error by not striking Juror No. 1 for cause *sua sponte.*

Since this claim of error is unpreserved, it is reviewed in accordance with the standard enunciated in *Cosby v. Commonwealth,* Ky., 776 S.W.2d 367, 369 (1989), *cert. denied,* 493 U.S. 1063, 110 S.Ct. 880 (1990), *overruled on other grounds, St. Clair v. Roark, supra, i.e.,* whether there was a reasonable justification or explanation for defense counsel's failure to object, tactical or otherwise, and whether the totality of the circumstances is persuasive either that the defendant would not have been found guilty of the capital offense or that the death penalty may not have been imposed but for the unpreserved error. Counsel's decisions during voir dire are generally considered to be matters of trial strategy. *Teague v. Scott,* 60 F.3d 1167, 1172 (5th Cir.1995); *see also Nguyen v. Reynolds,* 131 F.3d 1340 (10th Cir.1997), *cert. denied,* 525 U.S. 852, 119 S.Ct. 128, 142 L.Ed.2d 103 (1998). Defense counsel's decision not to move to excuse Juror No. 1 for cause was clearly a tactical decision. Also, Juror No. 1 did not sit on the case and Appellant was not required to use a peremptory strike to excuse him. Thus, the failure to excuse this juror for cause could not possibly have impacted the outcome of this case. *Compare Thomas v. Commonwealth,* Ky., 864 S.W.2d 252 (1993), *cert. denied,* 510 U.S. 1177, 114 S.Ct. 1218, 127 L.Ed.2d 564 (1994).

 *Juror No. 51,* like Juror No. 1, acknowledged that he would consider the full range of penalties, but balked at the prospect of imposing the minimum sentence of twenty years as punishment for committing two intentional murders. Nevertheless, he stated that he would not automatically exclude consideration of the minimum penalty and would consider the full range of penalties. While a juror is disqualified if he or she cannot consider the minimum penalty, *Grooms v. Commonwealth,* Ky., 756 S.W.2d 131 (1988), excusal for cause is not required merely because the juror favors severe penalties,

so long as he or she will consider the full range of penalties. *Bowling v. Commonwealth,* Ky., 873 S.W.2d 175 (1993), *cert. denied,* 513 U.S. 862, 115 S.Ct. 176, 130 L.Ed.2d 112 (1994).

> Voir dire examination occurs when a prospective juror quite properly has little or no information about the facts of the case and only the most vague idea as to the applicable law. At such a time a juror is often presented with the facts in their harshest light and asked if he could consider imposition of a minimum punishment. Many jurors find it difficult to conceive of minimum punishment when the facts as given suggest only the most severe punishment.... A per se disqualification is not required merely because a juror does not instantly embrace every legal concept presented during voir dire examination.

*Mabe v. Commonwealth,* Ky., 884 S.W.2d 668, 671 (1994). Juror No. 51 stated that he would follow the law and consider the full range of penalties. That is all that is required on this issue. The trial judge was not required to excuse him for cause.

 *Juror No. 75* stated that she could *consider* the minimum penalty of twenty years in a case where a defendant was convicted of two intentional murders, but that she would "have trouble" *imposing* a minimum sentence in that circumstance. Nevertheless, she reiterated that she could consider the full range of penalties, including the minimum. There was no error in failing to excuse her for cause.

 *Juror No. 74* stated that if he were the defendant, he would prefer death to life in prison. However, he also stated that he would not automatically vote for the death penalty, but would vote for whatever penalty was justified by the facts of the case. *Compare Morgan v. Illinois,* 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992). He specifically stated that he would seriously consider the full range of penalties. The trial judge was not required to excuse Juror No. 74 for cause.

 *Juror No. 63* recognized Appellant's name and the names of several potential witnesses. She also had heard about the case, but had not formed an opinion as to Appellant's guilt or innocence. *Juror No. 72* had read about the case and the previous trial, but could not recall the outcome. She had not formed an opinion as to Appellant's guilt or innocence. A potential witness, whom Juror No. 72 had never met, was a distant relative of her former husband from whom she had been divorced for more than ten years. Her former husband had once purchased a beef cow from another potential witness. Juror No. 72 also had recently been the victim of a burglary and theft. She stated that neither her relationship with the two witnesses nor her status as a crime victim would affect her decision in this case. *Juror No. 73* also recognized Appellant's name. She did not know any of the details of the case, but had heard it was a "bad case." Two of her neighbors had been murdered fifteen years prior to this trial. She did not have an opinion as to Appellant's guilt or innocence and stated that the murders of her neighbors would not affect her decision in this case.

 "The fact that a prospective juror may have some knowledge of a case does not establish objective bias." *Foley v. Commonwealth*, Ky., 953 S.W.2d 924, 932 (1997), *cert. denied*, 523 U.S. 1053, 118 S.Ct. 1375, 140 L.Ed.2d 522 (1998); *see also Jacobs v. Commonwealth*, Ky., 870 S.W.2d 412 (1994).

> There is no per se rule that mere exposure to media reports about a case merits exclusion of a juror. To the contrary, in order to merit disqualification of a juror, the media reports must engender a predisposition or bias that cannot be put aside, requiring the juror to decide a case one way or the other.... There is no constitutional prohibition against jurors simply knowing the parties involved or having knowledge of the case. The Constitution does not require ignorant or uninformed jurors; it re-

quires impartial jurors. While it may be sound trial strategy for an attorney to exclude anyone with knowledge of the facts or the parties, such a result is not mandated by the Constitution.

*McQueen v. Scroggy,* 99 F.3d 1302, 1319–20 (6th Cir.1996), *cert. denied sub nom., McQueen v. Parker,* 520 U.S. 1257, 117 S.Ct. 2422, 138 L.Ed.2d 185 (1997). The mere fact that Jurors Nos. 63, 72 and 73 possessed some prior knowledge of the case did not warrant their excusal for cause. Juror No. 72's relationship with the two witnesses was not so close as to warrant her excusal for cause. *Compare Marsch v. Commonwealth, supra; Ward v. Commonwealth,* Ky., 695 S.W.2d 404 (1985). The facts that Juror No. 72 had been the victim of a burglary and theft and that Juror # 73's neighbors had been murdered did not warrant excusal of either juror for cause. *Stoker v. Commonwealth,* Ky., 828 S.W.2d 619 (1992); *Stark v. Commonwealth,* Ky., 828 S.W.2d 603 (1991), *overruled on other grounds, Thomas v. Commonwealth,* Ky., 931 S.W.2d 446 (1996); *Whalen v. Commonwealth,* Ky. App., 891 S.W.2d 86 (1995), *overruled on other grounds, Moore v. Commonwealth,* Ky., 990 S.W.2d 618 (1999).

### 2. Death Qualification of Jury.

. Appellant claims it was error to excuse six prospective jurors because they could not consider imposition of the death penalty. This argument has been consistently rejected by both the United States Supreme Court and by this Court. *E.g., Buchanan v. Kentucky,* 483 U.S. 402, 107 S.Ct. 2906, 97 L.Ed.2d 336 (1987); *Lockhart v. McCree,* 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986); *Tamme v. Commonwealth,* Ky., 973 S.W.2d 13, 25 (1998), *cert. denied,* 525 U.S. 1153, 119 S.Ct. 1056, 143 L.Ed.2d 61 (1999); *Sanders v. Commonwealth,* Ky., 801 S.W.2d 665, 672 (1990), *cert. denied,* 502 U.S. 831, 112 S.Ct. 107, 116 L.Ed.2d 76 (1991). Our views on this issue remain unchanged.

### 3. Limitations on Voir Dire.

During group voir dire, defense counsel advised the jury that one witness for the Commonwealth (Bartley) had originally been indicted and charged as a co-defendant, then began asking jurors individually whether they would be inclined to think that this witness would "possibly get a benefit for his testimony." The trial judge sustained an objection to this line of questioning and advised the jurors that in weighing the evidence they should take into account the motive of a witness for testifying. In *Ward v. Commonwealth, supra,* we noted that the trial judge has broad discretion in the area of questioning on voir dire and held that the judge did not abuse his discretion in limiting a similar line of questioning in that case.

The trial judge also sustained an objection to defense counsel's questioning of the jurors as to what kinds of cases they believed would be appropriate for a death sentence. In *Tamme v. Commonwealth, supra,* at 25, we upheld the trial judge's limitation of a similar line of questions. "[Q]uestions are not competent when their evident purpose is to have jurors indicate in advance or commit themselves to certain ideas and views upon final submission of the case to them." *Ward v. Commonwealth, supra,* at 407.

Finally, Appellant tendered a motion containing fifty-seven questions regarding the death penalty and pre-trial publicity to be asked of each potential juror during individual voir dire. The trial judge declined. However, except as discussed above, defense counsel was not limited in his own questioning of prospective jurors on issues related to the death penalty and pre-trial publicity. The trial judge did not abuse his discretion in refusing to ask each juror each of the fifty-seven questions tendered by Appellant.

### 4. Courtroom Security.

Appellant claims that the courtroom security provided at his trial consisted of an excessive, visible police presence which created an impression on the jury that he was a dangerous and guilty man. The courtroom security detail consisted of two uniformed bailiffs, two uniformed state police officers, and several additional officers who were not in uniform. The two uniformed state troopers were located ten feet away from the defendant. The non-uniformed officers were located either in the gallery or in the back of the courtroom. We do not view this security force as excessive in view of Appellant's previous conviction and sentence to death in this case and his previous conviction and sentence to death for a similar burglary/murder committed in August 1985. *Sub nom., Epperson v. Commonwealth,* Ky., 809 S.W.2d 835 (1990), *cert. denied,* 502 U.S. 1037, 112 S.Ct. 885, 116 L.Ed.2d 789 (1992). Nor do we believe that the presence of armed policemen in the courtroom constitutes prejudice *per se.*

[T]he presence of guards at a defendant's trial need not be interpreted as a sign that he is particularly dangerous or culpable. Jurors may just as easily believe that the officers are there to guard against disruptions emanating from outside the courtroom or to ensure that tense courtroom exchanges do not erupt into violence. Indeed, it is entirely possible that jurors will not infer anything at all from the presence of the guards. If they are placed at some distance from the accused, security officers may well be perceived more as elements of an impressive drama than as reminders of the defendant's special status. Our society has become inured to the presence of armed guards in most public places; they are doubtless taken for granted so long as their numbers or weaponry do not suggest particular official concern or alarm.

*Holbrook v. Flynn,* 475 U.S. 560, 569, 106 S.Ct. 1340, 1346, 89 L.Ed.2d 525 (1986). We would add to those observations that the jury might even believe that the officers were in the courtroom to protect the presumptively innocent defendant from violent retribution by the family or friends

of the victims. In *Holbrook v.. Flynn*, there were twelve uniformed officers in the courtroom, *i.e.*, two bailiffs, four uniformed state troopers sitting in the first row of the gallery behind defense counsel table, and six uniformed Committing Squad officers deployed around the courtroom. The security measures employed at Appellant's trial were far less pervasive than those upheld in *Holbrook v. Flynn*.

### 5. Discovery Issues Pertaining to Jury Selection.

 It was not error for the trial judge to deny Appellant's blanket pretrial motion that the Commonwealth disclose to Appellant "all past and present relationships between individuals associated with the prosecution of this case and with prospective jurors which are or should be reasonably known to the Commonwealth or the Court." *Smith v. Commonwealth*, Ky., 734 S.W.2d 437, 445 (1987), *cert. denied*, 484 U.S. 1036, 108 S.Ct. 762, 98 L.Ed.2d 778 (1988). Nor was it error for the trial judge to deny Appellant's motion to be provided with a list of Laurel County applicants for the position of state executioner. Appellant was not denied the right to question the prospective jurors as to their possible relationships with anyone connected with the prosecution or as to whether they had applied for the position of executioner.

### 6. Excusal of Alternate Jurors.

 The trial judge seated three alternate jurors. At the conclusion of the evidence, he instructed the clerk to place cards containing the numbers of all fifteen jurors in a box and draw three at random. The clerk did so and announced in open court that Juror No. 70, Juror No. 33 and Juror No. 42 would be excused. However, she did not identify the excused jurors by name. Three jurors then left the jury box and were excused by the judge. During the poll of the jury after return of the guilt phase verdicts, it was discovered that Juror No. 3 had been mistakenly excused

and that Juror No. 33 had remained and participated in the verdict.

Appellant asserts he is entitled to a new trial because this unexpected turn of events constituted a substantial deviation from jury selection procedures and denied him his right to a randomly selected jury. The procedure used to excuse the alternate jurors was in accordance with CR 47.02.[1] The problem was not the procedure, but the fact that two jurors apparently misunderstood the clerk with the result that the wrong juror was excused. We agree that preservation of randomness is a central principle in the jury selection process. However, "[r]andomness means that, at no time in·the jury selection process will anyone involved in the action be able to know in advance, or manipulate, the list of names who will eventually compose the ... jury." *Williams v. Commonwealth*, Ky.App., 734 S.W.2d 810, 812–13 (1987). Appellant does not suggest that this irregularity occurred because of any premeditation or manipulation of the jury selection process.

 Nor does Appellant assert that he was prejudiced by the fact that Juror No. 33 deliberated his guilt or innocence instead of Juror No. 3. Appellant did not move during voir dire to strike either of these jurors for cause and does not claim on appeal that Juror No. 33 was unqualified to serve on his case. The purpose in seating alternate jurors in a lengthy trial is to protect against the unexpected and thereby ensure that at least twelve qualified jurors will still be available to deliberate a verdict at the conclusion of the trial. In *McQueen v. Commonwealth*, Ky., 669 S.W.2d 519 (1984), *cert. denied*, 469 U.S. 893, 105 S.Ct. 269, 83 L.Ed.2d 205 (1984), a juror was excused as the alternate because she violated an admonition. In *Davis v. Commonwealth*, Ky., 795 S.W.2d 942 (1990), a juror was excused as the alternate because he became ill during the trial. In *Johnson v. Commonwealth*, Ky., 892

---

1. Appellant does not complain that three alternate jurors were seated rather than two.

S.W.2d 558 (1994), a juror was excused as the alternate primarily because he insisted that he be excused. The result here is the same as if Juror No. 3 had become ill during the trial or had simply failed to show up on the last day. He would have been *declared* an alternate juror, two additional jurors would have been randomly excused, and the trial would have proceeded, as it did, with twelve qualified jurors. "[A defendant] does not have a constitutional right to have a particular person sit as a juror. He merely has the right to have a particular class of persons on the jury and the right to exclude certain individuals." *McQueen v. Scroggy, supra,* at 1327. This inadvertent error in the proceedings, though bizarre, was harmless.

## IV. SUFFICIENCY OF THE EVIDENCE.

 Appellant claims that the testimonies of Donald Bartley and Sherry Hamilton were so contradictory as to be insufficient to support the verdicts returned in this case. He points out that there was no physical evidence to prove that he was even present when these crimes occurred. The test is whether, drawing all fair and reasonable inferences from the evidence in favor of the Commonwealth, the evidence is sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty. *Commonwealth v. Benham,* Ky., 816 S.W.2d 186 (1991). A conviction can be sufficiently supported even by the uncorroborated testimony of an accomplice. *Murphy v. Commonwealth,* Ky., 652 S.W.2d 69 (1983), *cert. denied,* 465 U.S. 1072, 104 S.Ct. 1427, 79 L.Ed.2d 751 (1984). The testimonies of Bartley and Hamilton were substantially consistent with respect to Appellant's participation in the crimes, and were consistent with the findings of the medical examiner and the ballistics expert. The absence of physical evidence is partially explained by the testimony that Appellant disposed of the weapons and his bloody clothing. The evidence was sufficient to support the convictions.

## V. EVIDENTIARY ISSUES.

### 1. Use of Prior Testimony.

 Donald Bartley testified under oath at Appellant's 1987 trial and was cross-examined by both Appellant's counsel and counsel for Roger Epperson. When called as a witness at the 1996 trial, Bartley refused to testify on Fifth Amendment grounds. The trial judge ruled that since Bartley had previously pled guilty to his participation in these crimes, he no longer could claim the privilege against self-incrimination and ordered him to testify.[2] When Bartley persisted in his refusal,

---

**2.** At the time Bartley invoked the privilege against self-incrimination, there was still pending in the Letcher Circuit Court an RCr 11.42 petition to vacate his guilty pleas with respect to his involvement in the so-called "Acker case," *Epperson v. Commonwealth, supra.* The record is unclear whether there was also pending a petition to vacate his guilty pleas with respect to his involvement in the offenses committed against the Morrises. If not, then he was not entitled to invoke the privilege. *Shelton v. Commonwealth,* Ky., 471 S.W.2d 716 (1971). But if so, the privilege may have been available to him. As a general proposition, the privilege against self-incrimination may be invoked whenever a witness has a real and appreciable apprehension that the information requested could be used against him in a future criminal proceeding. *Murphy v. Waterfront Comm'n of New York Harbor,* 378 U.S. 52, 94, 84 S.Ct. 1594, 1611,

12 L.Ed.2d 678 (1964); *Mason v. United States,* 244 U.S. 362, 37 S.Ct. 621, 61 L.Ed. 1198 (1917). If an RCr 11.42 motion with respect to his guilty pleas in the Morris case was pending at the time of Hodge's 1996 retrial, and if that motion was subsequently granted, Bartley could have been tried for his involvement in this case; and any testimony given by him in the Hodge trial could have been used against him at his own subsequent trial. It has been held that the possibility of further incrimination under those circumstances is not so remote as to deprive the witness of the right to assert the privilege. *Ottomano v. United States,* 468 F.2d 269, 273–74 (1st Cir.1972), *cert. denied,* 409 U.S. 1128, 93 S.Ct. 948, 35 L.Ed.2d 260 (1973); *see also People v. Edgeston,* 157 Ill.2d 201, 191 Ill.Dec. 84, 623 N.E.2d 329 (1993), *cert. denied,* 512 U.S. 1246, 114 S.Ct. 2766, 129 L.Ed.2d 879

the trial judge declared him unavailable and allowed the Commonwealth to read to the jury a redacted version of his 1987 testimony.

The trial judge's ruling was in accord with KRE 804(a)(2) and KRE 804(b)(1), which specifically permit the prior testimony of a witness to be read in a subsequent trial if the witness persists in refusing to testify despite an order of the court to do so. However, the offenses for which Appellant was being tried were committed prior to July 1, 1992, the effective date of the Kentucky Rules of Evidence, so the issue becomes whether Bartley's prior testimony would have been admissible under pre-existing law. KRE 107(b). Appellant relies on former KRS 422.150, which was repealed contemporaneously with the adoption of the Kentucky Rules of Evidence,[3] and which provided:

> The testimony of any witness taken by a stenographic reporter may, in the discretion of the court in which it is taken, be used as evidence in any subsequent trial of the same issue between the same parties, where the testimony of such witness cannot be procured, *but no testimony so taken shall be used in any criminal case without the consent of the defendant.* (Emphasis added.)

This statute was first enacted in 1893,[4] long before the 1962 adoption of the rules of criminal procedure and the 1975 ratification of Section 116 of our Constitution. In *Wells v. Commonwealth,* Ky., 562 S.W.2d 622 (1978), *cert. denied,* 439 U.S. 861, 99 S.Ct. 181, 58 L.Ed.2d 170 (1978), we held that the statutory proscription against the admissibility of prior testimony in a criminal case without the consent of the defendant had been superseded by the criminal rules, specifically RCr 7.20 and 7.22. *Wells* held that prior testimony may be used in a criminal case when the wit-

ness's unavailability resulted from the invocation of a privilege, even though RCr 7.20 did not specifically so provide. Although no pre–1992 Kentucky case addressed whether prior testimony could be used when a witness persistently refuses to obey a court order to testify, we specifically adopted in *Crawley v. Commonwealth,* Ky., 568 S.W.2d 927, 931 (1978), *cert. denied,* 439 U.S. 1119, 99 S.Ct. 1028, 59 L.Ed.2d 79 (1979) the definition of unavailability contained in Rule 804(a) of the Federal Rules of Evidence. FRE 804(a)(2) was then and is now identical to KRE 804(a)(2) in declaring a witness unavailable who "persists in refusing to testify concerning the subject matter of the declarant's statement despite an order of the court to do so." Since Bartley's prior testimony would have been admissible under pre–1992 law, there was no error in admitting it at Appellant's 1996 trial.

*2. Use of RCr 11.42 Petition to Impeach.*

During direct examination of Bartley at the 1987 trial, the following colloquy occurred between the witness and the Commonwealth's Attorney:

Q. Mr. Bartley, have I, as the Commonwealth Attorney, offered you any kind of deal in exchange for your testimony in this case?

A. No sir.

Q. Have I, as the Commonwealth Attorney, to your knowledge, authorized any such a deal?

A. No sir.

On cross-examination, defense counsel obtained the following clarification:

Q. Mr. Bartley, you testified that there was no deal offered to you in this case is that correct?

A. I testified Mr. Craft offered me no deal.

(1994); *cf. State v. Marks,* 194 Wis.2d 79, 533 N.W.2d 730 (1995).

**3.** 1990 Ky.Acts ch. 88 § 92, effective July 1, 1992 pursuant to 1992 Ky.Acts ch. 324 § 33.

**4.** 1893 Ky.Acts ch. 269 § 7.

Q. Well, isn't it true that someone has offered you a deal on behalf of the Commonwealth?

A. I talked with Ronnie Gay and an Assistant Commonwealth Attorney from Jackson County and they said that they would try to have it run concurrently with the Acker case.

The "Acker case," *Epperson v. Commonwealth, supra,* was another and more notorious burglary and murder case in which Appellant and Epperson were convicted and sentenced to death in the Letcher Circuit Court partially on the basis of Bartley's testimony. Following an objection by Epperson's attorney to any reference to the Acker case, Appellant's counsel continued the line of questioning:

Q. You have made deals with the Commonwealth before, have you not?

A. On the Acker case, yes.

Following another objection by Epperson's attorney, Appellant's counsel questioned Bartley at length regarding other deals he had made with the Commonwealth with respect to charges brought in other cases in Harlan County. At the 1996 trial, Bartley's prior testimony was redacted to substitute the words "another case" for "the Acker case," so that Appellant was able to impeach Bartley's "no deal" testimony without being prejudiced by mention of the Letcher County case.

Appellant then sought to introduce a copy of a verified RCr 11.42 petition filed by Bartley on October 9, 1996 in the Letcher Circuit Court with respect to the Acker case. The petition contains the following assertion:

That the Commonwealth Attorney refused to honor his plea agreement to wit: a sentence of 200 years, all other charges were to run concurrent with the 200 years making a total of 200 years. The Commonwealth specifically stated that Mr. Bartley would receive parole after serving 8 years in the Kentucky State Penitentiary.

An unverified memorandum filed in support of the petition refers to Bartley's agreement to cooperate with the Commonwealth on charges brought in *Clay County* against Appellant and Epperson, but makes no mention of these Jackson County charges which were tried in Laurel County. To reiterate, the verified petition makes no reference to any charges except those in Letcher County, and the unverified memorandum discusses a deal only with respect to charges brought in Clay County. Appellant claims the reference to Clay County was an error and that the deal actually pertained to these charges which originated in Jackson County. Perhaps; but (1) there is nothing in the record to prove that assertion, and (2) the memorandum is unverified and does not even contain Bartley's signature. The trial judge did not abuse his discretion in overruling the motion to introduce these documents to further impeach Bartley's "no deal" testimony.

### 3. Witness's Psychiatric Records.

The witness Sherry Hamilton was treated at Ridgeview Psychiatric Hospital and Center, Inc., in Oak Ridge, Tennessee, from May 9, 1984 to May 21, 1985 and from July 30, 1986 to January 19, 1987. Appellant desired to examine the records of Hamilton's treatment to ascertain if they contained any information which could be used to impeach her trial testimony. The records were furnished under seal to the trial judge, who, pursuant to *Eldred v. Commonwealth,* Ky., 906 S.W.2d 694, 702 (1994), *cert. denied,* 516 U.S. 1154, 116 S.Ct. 1034, 134 L.Ed.2d 111 (1996), reviewed the records *in camera* and determined that they did not contain information sufficiently relevant to overcome the psychotherapist-patient privileges set forth in the laws of both Kentucky and Tennessee. KRE 507 and former KRS 421.215 and KRS 319.111 (both repealed by 1990 Ky.Acts ch. 88 § 92, effective July 1, 1992 pursuant to 1992 Ky.Acts ch. 324 § 33); Tenn.Code Ann. § 24–1–207. While the applicable laws of both states contain ex-

ceptions to the privilege, there is no exception applicable to a scenario where the patient is merely a witness in a civil or criminal case.

■■■■■ However, in *Eldred, supra,* at 701–03, we recognized that the privilege is subject to a criminal defendant's right to obtain exculpatory information, *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and to confront the witnesses against him. U.S. Const. amend. VI; Ky. Const. § 11. Exculpatory evidence includes information regarding the credibility of a prosecuting witness, *Eldred, supra,* at 701–02, and the right to confrontation includes the right to meaningful cross-examination, particularly the right to impeach a witness's credibility. *Davis v.. Alaska,* 415 U.S. 308, 315–17, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974); *Harris v. Commonwealth,* Ky., 315 S.W.2d 630 (1958).

■■■■ Nevertheless, having reviewed the psychiatric records in question, we find that the trial judge correctly concluded that they contain no information sufficiently relevant to overcome the claim of privilege. The records of the 1984–85 admission reflect an admitting diagnosis of "conduct disorder—socialized aggressive" and a discharge diagnosis of "borderline personality disorder." The 1986–87 admission reflects both an admitting and discharge diagnosis of (1) adjustment reaction with depressed mood and (2) borderline personality disorder. Nothing in the records of either admission indicates any significant hostility toward Appellant, with whom Hamilton lived for six years and whom she married after his incarceration for these offenses.[5] The 1986–87 psychiatric records indicate that the primary cause of her depression was the fact that Appellant had recently been convicted of murder (apparently, the Acker murder) and sentenced to death. Appellant ignores the more recent in-patient records

and the 1985 discharge diagnosis, and seizes upon the 1984 admitting diagnosis of "conduct disorder," then cites the American Psychiatric Association's DSM–III–R to the effect that one of the diagnostic criteria for conduct disorder is "often lies (other than to avoid physical or sexual abuse)." Armed with this extrapolation, Appellant speculates that he might have found an expert to testify that Hamilton was mentally unable to testify truthfully against him at his 1996 trial, and thereby impeach her credibility as a witness. This claim is simply a reach too far, especially since the diagnosis of "conduct disorder" was twelve years old at the time of Hamilton's 1996 testimony and that diagnosis was not repeated in the 1985 discharge summary or in either the admission or the discharge summaries for the 1986–87 admission.

We note in passing that defense counsel was able to mount a substantial attack on Hamilton's credibility despite the absence of any assistance from her psychiatric records. Hamilton admitted during cross-examination that she had often lied while living with Appellant; that she had lied to her parents about an automobile accident when she was a teenager; that she had forged receipts of mortgage payments to deceive her previous husband; that she lied to the police, to attorney Elizabeth Shaw, and to the news media when she said Appellant was not involved in the Morris murders; that she lied to the FBI when she said that she had not seen Appellant on the date of the homicides; that she had counseled others on how to lie effectively; and that she was paid $10,000.00 and other benefits to enter into a fraudulent marriage to a foreign national while she was living with Appellant. She also admitted to being extremely jealous of Appellant's relationships with other women and that she had once threatened Appellant with a firearm. All of this evidence

5. Hamilton did not testify against Appellant either in the Acker case or at his 1987 trial for the Morris offenses.

was admitted without objection despite the proscription in CR 43.07 against impeachment by evidence of "particular wrongful acts."

### 4. Other Crimes, Wrongs, or Acts.

■ An order entered four days prior to the beginning of trial and presumably pursuant to KRE 404(c) directed the Commonwealth *inter alia* to disclose to Appellant "evidence of prior bad acts of the defendant . . . to the extent that the Commonwealth has represented to the Court that it has complied with this requirement and the Commonwealth shall file for the record herein a written statement declaring such." No such written statement is found in the record.

Appellant complains that Sherry Hamilton testified to other crimes, wrongs, or acts committed by him in violation of KRE 404(b) and the pre-trial order. None of this evidence was elicited during the direct examination of Hamilton, which lasted eight minutes. Hamilton answered as follows to questions asked on cross-examination by defense counsel:

(a) Was it true that she had told many lies in her life? Hamilton responded that she had told a lot of lies when she was living with Appellant in order to protect him from the law.

(b) What benefits did she obtain from her fraudulent marriage to the foreign national? Hamilton replied that she was paid $10,000.00 and that the foreign national paid utility bills and car insurance for her and Appellant and bought them a new car. (Appellant complains that this response implicated him in the "immigration scam.")

(c) Had she ever seen Appellant with his hair peroxided *after* June 16, 1985? Hamilton responded that Appellant's hair was peroxided while he was "on the run" in Florida. (This would not be a KRE 404(b) act, because Appellant was "on the run" in Florida to avoid apprehension for commission of these crimes.)

(d) Had she ever seen Appellant with his hair peroxided *before* June 16, 1985? Hamilton responded that she had asked him to lighten his hair.

(e) Did Appellant use cocaine on a regular basis, and was it not true that he was a body builder? Hamilton replied that Appellant did not use cocaine on a regular basis, but that he smoked "pot" on a daily basis.

(f) Did Appellant frequently wear a beard? Hamilton responded that Appellant normally wore a beard, but that he would shave it off if he was "fixing to do a job."

(g) Did Appellant for the most part wear tennis shoes? Hamilton responded that Appellant wore tennis shoes except when he was going to "do a robbery."

The following information was elicited from Hamilton on redirect examination:

(a) The reason she lied to the FBI about whether she had seen Appellant on the day of the murders was because he was "on the run" from the state of Georgia.

(b) The reason she told the majority of her lies was to protect Appellant from the law.

(c) *Before* June 16, 1985, Appellant peroxided his hair to disguise himself "for other crimes."

■ Since the Commonwealth did not introduce any of this evidence in its case in chief, there was no violation of the pre-trial order. KRE 404(c). The answers given by Hamilton on cross-examination were responsive to the questions asked by defense counsel. "One who asks questions which call for an answer has waived any objection to the answer if it is responsive." *Mills v. Commonwealth*, Ky., 996 S.W.2d 473, 485 (1999) (quoting *Estep v. Commonwealth*, Ky., 663 S.W.2d 213, 216 (1983)).

At no time during or after the cross-examination of Hamilton did defense counsel object to her answers, request that the witness be admonished against testifying about "other crimes," or request that the

jury be admonished to disregard her answers. Nor did defense counsel object or ask for an admonition during the prosecutor's inquiries on redirect examination. It was only after Hamilton had been excused and the jury had been discharged for the weekend that defense counsel moved for a mistrial on the basis of an alleged violation of the pre-trial order. When the judge pointed out that counsel had not objected or requested an admonition, counsel stated that he believed such would have only further emphasized the witness's allegedly improper statements. Regardless of the wisdom of that strategy, the real damage was done during Hamilton's testimony on cross–examination, and counsel clearly made a tactical decision to continue attempting to impeach the credibility of this obviously hostile witness without requesting judicial intervention. *Cosby v. Commonwealth, supra.*

*5. References to Prior Trial.*

In a pre-trial ruling, the trial judge ordered that no reference be made to Appellant's previous trial for these crimes. During cross-examination, Sherry Hamilton made the following responses to questions asked by defense counsel:

a. When asked when she first decided to testify at the trial of this case, Hamilton responded that she first decided to testify when she found out there was going to be a retrial.

b. When asked if the bottom line was that she had waited four years before she contacted Mr. Kincaid (an FBI agent), Hamilton responded that she contacted Kincaid when she found out that "they were going to be retried."

The answers were responsive to the questions. As with the "other acts" evidence, there was neither an objection nor a request for an admonition. We do not believe that the jury must have concluded from these isolated references that Appellant had been previously convicted of murder and sentenced to death for these same charges. *Tamme v. Commonwealth, supra,* at 34.

*6. Alleged Inflammatory Evidence.*

The jury was permitted to view crime scene photographs and a videotape of the crime scene, all made at the time of the initial police investigation, and one photograph of Edwin Morris's body laying on the autopsy table. The latter photograph was taken before any dissection of the body occurred and revealed only the victim's head and chest areas. It was introduced to show the jury both the location of the gunshot wounds and the sock which had been stuffed into the victim's mouth as a gag. Though gruesome, the photographs and videotape were of probative value and, thus, admissible into evidence. *Dillard v. Commonwealth,* Ky., 995 S.W.2d 366, 370 (1999), *cert. denied,* — U.S. ——, 120 S.Ct. 508, 145 L.Ed.2d 393 (1999); *Bedell v. Commonwealth,* Ky., 870 S.W.2d 779 (1993); *Epperson v. Commonwealth, supra,* at 843; *Milburn v. Commonwealth,* Ky., 788 S.W.2d 253 (1989). Although the videotape did depict several knives at the scene, no suggestion or insinuation was made that they belonged to Appellant or his accomplices, or that they were used in the murders. *Compare Rowe v. Commonwealth,* Ky., 269 S.W.2d 247 (1954). The pillows through which gunshots had been fired were relevant and admissible to show the execution-style manner in which the victims had been murdered.

*7. Adoptive Admission.*

Sherry Hamilton testified that on the day after the murders, she, Appellant and Donald Bartley were watching a television news program at the Knight's Inn in Corbin when the program began showing a crime scene investigation:

And Donnie Bartley was jumping around saying, "[t]hat's what we did, man, that's, that's, they're talking about us. They're talking about us." And Benny Hodge told Donnie Bartley to go outside. He said, "[g]o outside for

awhile, man." So, he went outside and I asked Benny what he was talking about. He said, "[t]hat's what we did last night."

Appellant characterizes this testimony as a *Bruton* violation, *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), because Bartley did not testify in person at the 1996 trial and was not subject to cross-examination with respect to this out-of-court statement. We disagree. Bartley's statement was properly admitted as an adoptive admission both under KRE 801A(b)(2) and under pre–1992 evidence law. *Cf. Griffith v. Commonwealth*, 250 Ky. 506, 63 S.W.2d 594 (1933), *overruled on other grounds, Colbert v. Commonwealth*, Ky., 306 S.W.2d 825 (1957), *overruled on other grounds, Morton v. Commonwealth*, Ky., 817 S.W.2d 218 (1991).

> When accusatory or incriminating statements are made in the presence and hearing and with the understanding of the accused person and concerning a matter within his knowledge, under such circumstances as would seem to call for his denial and none is made, those statements, and the fact that they were not contradicted, denied, or objected to, become competent evidence against the defendant.... Related to this specific rule is that which admits evidence of the circumstances when the accused makes a reply which of itself is to be regarded as an admission....

*Griffith v. Commonwealth, supra,* at 596.

### 8. Humanization of Victims.

 Appellant claims it was prejudicial error for the victims' sons to testify, *e.g.,* that their parents had worked hard to accumulate the money and jewelry for which they were killed and that Bessie Morris cherished the ring and earrings that were stolen from her; that the victims were elderly and infirm, thus unable to resist an armed robbery; that they had attended church earlier on the day they were killed (father's day); and that the four-leaf clovers which Bessie Morris collected were found scattered on her deathbed. Appellant characterizes this type of evidence as "glorification" of the victims. We characterize it as no more than "humanization" of the victims.

> A murder victim can be identified as more than a naked statistic, and statements identifying the victims as individual human beings with personalities and activities does not unduly prejudice the defendant or inflame the jury. Just as the jury visually observed the appellant in the courtroom, the jury may receive an adequate word description of the victim as long as the victim is not glorified or enlarged.

*Bowling v. Commonwealth*, Ky., 942 S.W.2d 293, 302–03 (1997), *cert. denied,* 522 U.S. 986, 118 S.Ct. 451, 139 L.Ed.2d 387 (1997) (citation omitted). Appellant was not unduly prejudiced by the introduction of this testimony.

### 9. Impeachment of Tammy Gentry.

 Tammy Gentry was a witness for the defense. Her testimony was presented by way of a video recording of her pre-trial deposition. According to Gentry, she and her then husband, Ronald Gentry, were incarcerated in the Laurel County Jail at the same time that Appellant, Roger Epperson and Donald Bartley were incarcerated and awaiting trial on these charges. Ronald Gentry shared a cell with Appellant and Epperson. Tammy Gentry's cell was near that occupied by Bartley, who was permitted to visit her in her cell. On one such occasion, Bartley told Gentry that he had killed the Morrises, that Appellant and Epperson were not involved, and that he was going to plea bargain for 200 years and "go up for parole." Appellant takes issue with four areas of inquiry on cross-examination:

(a) If, as she testified, she had not told anyone about Bartley's statements, how did defense counsel's investigator know to interview her? Answer: They were told

by a jail matron who had overheard Bartley's statements.

(b) Was Ronald Gentry promised any money by Appellant or Epperson for Tammy Gentry's testimony? Answer: She did not know.

(c) How many different names had she used during the last ten years? Answer: Four or five.

(d) How many and for what types of felonies had she been convicted? Answer: "Plenty," clarified as more than five, all thefts or forgeries.

 The first inquiry was harmless and had a relevant factual basis; and no prejudice resulted since the witness had a plausible explanation. The second inquiry had a relevant factual basis, because the witness's husband was housed in the same cell with Appellant and Epperson, who were alleged to have stolen large sums of money from the Morrises and the Ackers. Appellant asserts that the "other names" inquiry was an improper attempt to impeach the witness's credibility by use of "particular wrongful acts." CR 43.07; *Tamme v. Commonwealth, supra,* at 29. The use of a different name is not a wrongful act *per se.* A different name may be acquired by marriage, or may be used for self-protection rather than for a criminal purpose. This inquiry only acquired "wrongful act" status when the witness stated that she used aliases because she led a life of crime.

 A more difficult issue is presented by the prosecutor's inquiry as to both the number and the nature of her prior convictions. This type of impeachment was once permitted in this jurisdiction, *Martin v. Commonwealth,* Ky., 507 S.W.2d 485 (1974); and there is a certain logic in the assertion that a witness who has been convicted of five felonies is less credible than a witness who has been convicted of only one felony. Nevertheless, without specifically overruling *Martin,* the procedure for impeaching a witness with a prior felony conviction was established in

*Commonwealth v. Richardson,* Ky., 674 S.W.2d 515 (1984) as follows:

[A] witness may be asked if he has been previously convicted of a felony. If his answer is "Yes," that is the end of it and the court shall thereupon admonish the jury that the admission by the witness of his prior conviction of a felony may be considered only as it affects his credibility as a witness, if it does so. If the witness answers "No" to this question, he may then be impeached by the Commonwealth by the use of all prior convictions, and to the extent that *Cowan [v. Commonwealth,* Ky., 407 S.W.2d 695 (1966) ] limits such evidence to *one* prior conviction, it is overruled. After impeachment, the proper admonition shall be given by the court.

*Id.* at 517–18. Pursuant to *Richardson,* an interrogator can impeach a witness with *all* prior felony convictions only if the witness first denies having been convicted of *any* prior felonies. Since Gentry did not deny being a convicted felon, it was error to permit the Commonwealth's attorney to question her as to the number and nature of all of her prior felony convictions.

 Nevertheless, the error was harmless in this case, because there is no reasonable possibility that, absent the error, the verdict would have been different. RCr 9.24; *Harman v. Commonwealth,* Ky., 898 S.W.2d 486, 489 (1995); *Renfro v. Commonwealth,* Ky., 893 S.W.2d 795 (1995). The harmless error doctrine "recognizes the principle that the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence ... and promotes public respect for the criminal process by focusing on the underlying fairness of the trial rather than on the virtually inevitable presence of immaterial error." *Delaware v. Van Arsdall,* 475 U.S. 673, 681, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674 (1986). The jury knew that Gentry was a criminal. She readily admitted that she had "led a life of crime." She was serving time in the Laurel County Jail at the time of her alleged

discussion with Bartley. Even the proper impeachment inquiry would have elicited the fact that she was a convicted felon. More importantly, her status was only that of a witness; thus, there was no danger that the improper evidence would be considered for any purpose other than to affect her credibility. Compare *Commonwealth v. Richardson, supra,* in which the defendant was on trial for burglary and was impeached by evidence of his prior conviction of another burglary. We further note that defense counsel was permitted to elicit during cross-examination of the Commonwealth's key witness, Bartley, that he had been convicted of four prior felonies, including three burglaries, in the Harlan Circuit Court. Under these circumstances, we do not believe that the admission of evidence of Gentry's prior convictions so prejudiced Appellant as to deny him a fair trial. *Cf. Bennett v. Commonwealth,* Ky., 978 S.W.2d 322, 326 (1998).

*10. Double hearsay.*

■ Appellant asserts error in the trial judge's refusal to permit his former attorney, Elizabeth Shaw, to testify that Sherry Hamilton told her that Bartley had told Hamilton that he killed the Morrises. Double hearsay is admissible only if each part of the combined statements conforms with an exception to the hearsay rule. KRE 805; *Thurman v. Commonwealth,* Ky., 975 S.W.2d 888, 893 (1998), *cert. denied,* 526 U.S. 1009, 119 S.Ct. 1150, 143 L.Ed.2d 217 (1999); *cf. Askew v. Commonwealth,* Ky., 768 S.W.2d 51 (1989). Bartley's part of the statement would have been admissible as a prior inconsistent statement, since he denied killing the Morrises. KRE 801A(a)(1); *Jett v. Commonwealth,* Ky., 436 S.W.2d 788 (1969). However, Hamilton's part of the statement does not fall within any exception to the hearsay rule. Hamilton's alleged statement to Shaw was not inconsistent with her testimony since she never testified that Bartley told her that he did *not* kill

the Morrises. Furthermore, since neither Bartley nor Hamilton were confronted at trial with their alleged prior inconsistent statements, the proper foundation was not laid for Shaw's proposed testimony. KRE 613(a); CR 43.08; *Norton v. Commonwealth,* Ky., 471 S.W.2d 302 (1971).

## VI. ALLEGED DISCOVERY VIOLATION.

■ On February 17, 1987, while this case was still pending in the Jackson Circuit Court, a discovery order was entered which required the Commonwealth to furnish Appellant with *inter alia* a "list of names and addresses of all persons who have knowledge pertaining to the case and/or who have been interviewed by the police or prosecution in connection with this case." It was subsequently learned that Kentucky State Police Detective Ronnie Gay had unilaterally deleted from his investigative report the names and addresses of confidential informants who, in his opinion, had not furnished any information relevant to the case. Appellant's motion to dismiss the indictment because of this discovery violation apparently was denied, though a formal ruling is not found in the record.

At all times relevant to this case, RCr 7.24 specifically precluded "pretrial discovery or inspection of reports, memoranda, or other documents made by officers and agents of the Commonwealth in connection with the investigation or prosecution of the case, or of statements made to them by witnesses or by prospective witnesses (other than the defendant)." [6] Thus, the trial judge exceeded his authority in entering a discovery order which essentially required the Commonwealth to furnish a witness list to Appellant. *Lowe v. Commonwealth,* Ky., 712 S.W.2d 944 (1986). Nevertheless, the order was valid until overruled and was clearly violated by the Commonwealth. In that event, RCr 7.24(9) pro-

6. The rule has been subsequently amended to allow discovery and inspection of official po-

lice reports, but otherwise remains essentially unchanged.

vides the trial judge with an array of available remedies, including "such other order as may be just under the circumstances." Presumably, the trial judge did not believe that dismissal of the indictment would be "just-under the circumstances;" and we are satisfied that he did not abuse his discretion in that regard.

## VII. INSTRUCTION ISSUES.

■ The trial judge did not err in refusing to instruct the jury with respect to the consideration which should be given to circumstantial evidence, accomplice testimony and inconsistent statements. Kentucky follows the "bare bones" principle with respect to jury instructions. Instructions such as those requested by Appellant tend to overemphasize particular aspects of the evidence. Evidentiary matters should be omitted from the instructions and left to the lawyers to flesh out during closing arguments. *Baze v. Commonwealth,* Ky., 965 S.W.2d 817, 823 (1997); *McGuire v. Commonwealth,* Ky., 885 S.W.2d 931, 936 (1994).

■ Nor did the trial judge err in refusing to instruct the jury on extreme emotional disturbance and first-degree manslaughter with respect to the homicide of Edwin Morris. Appellant premises this contention on Sherry Hamilton's testimony that Appellant told her that he killed Morris during a scuffle which ensued when Morris reached for a gun on the refrigerator. In *McClellan v. Commonwealth,* Ky., 715 S.W.2d 464 (1986), *cert. denied,* 479 U.S. 1057, 107 S.Ct. 935, 93 L.Ed.2d 986 (1987), we defined extreme emotional disturbance as follows:

> Extreme emotional disturbance is a temporary state of mind so enraged, inflamed, or disturbed as to overcome one's judgment, and to cause one to act uncontrollably from the impelling force of the extreme emotional disturbance *rather than from evil or malicious purposes.* It is not a mental disease in itself, and an enraged, inflamed, or disturbed emotional state does not consti-

tute an extreme emotional disturbance *unless there is a reasonable explanation or excuse therefor,* the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under circumstances as [the] defendant believed them to be.

*Id.* at 468–69 (emphasis added). Mere resistance by the victim of an armed robbery does not suffice to override the evil and malicious purpose which triggered that resistance. Nor does it constitute a reasonable explanation or excuse for an emotional state so enraged, inflamed or disturbed as to cause the perpetrator to kill the victim. Thus, there is no evidentiary basis for an instruction on extreme emotional disturbance in this case.

## VIII. DENIAL OF CONTINUANCE.

■ Appellant wished to present the testimony of Darcy O'Brien, who had interviewed Sherry Hamilton while writing a book about the Acker case. The trial was scheduled to begin on October 21, 1996. The record reflects that on October 6, 1996, Appellant obtained an order providing funds to pay for O'Brien's transportation from Oklahoma to Kentucky to give a deposition. On October 11, 1996, Appellant obtained an order pursuant to KRS 421.230, *et seq.,* to secure O'Brien's attendance at the proposed deposition. On October 16, 1996, Appellant learned that O'Brien was on his way to Rome, Italy, thus was unavailable for the proposed deposition. Appellant now claims it was reversible error to deny his last minute motion for a continuance in order to secure O'Brien's testimony. In support of the motion, Appellant filed an affidavit listing twenty-five incidents and/or statements related to O'Brien by Hamilton which would impugn Hamilton's character and thereby impeach her credibility. The absence of O'Brien's testimony did not prejudice Appellant's defense because (1) a witness may not be impeached by "particular wrongful acts," CR 43.07; and (2) virtually all of the incidents and/or statements in question

were admitted by Hamilton during her cross-examination.

■ Ann–Marie Charvat was the defense's "mitigation specialist." She was unable to attend the trial because she gave birth to a child on October 21, 1996, and her physician would not permit her to travel to Kentucky to attend the penalty phase, which began on October 30, 1996. On the morning of trial, October 21, 1996, Appellant renewed a previous motion for a continuance and tendered an affidavit of Charvat, which did not state what her proposed testimony would be or when she might be available to testify. The motion was overruled. On October 30, 1996, Appellant renewed his motion and submitted an additional affidavit stating that, if present, Charvat would testify that Appellant was raised in a physically abusive environment which adversely affected development of his "bonds of attachment;" that frequent school transfers adversely affected development of his "bonds of commitment;" that inconsistences in his life course adversely affected his ability to adopt conventional norms and values; and that these facts had led Charvat to conclude that it was unlikely that Appellant intentionally or personally committed these murders.

The trial judge also overruled the October 30th renewed motion, stating that Charvat was not an essential witness (presumably because other witnesses were available to testify to Appellant's childhood experiences and Charvat's testimony in that respect would be hearsay), and because he had not ruled that she was qualified to render an expert opinion with respect to Appellant's mental condition at the time these offenses were committed. We would add that since the jury had already found Appellant guilty of the Morrises' murders, Charvat's opinion that it was unlikely that he had committed those murders would be irrelevant and would not assist the jury in deciding an appropriate penalty. KRE 702; see also R. Lawson, *The Kentucky Evidence Law Handbook*

§ 6.10 at 149–50 (2d ed. Michie 1984) for pre-1992 law ("[t]he ultimate inquiry in ruling on the admissibility of expert testimony is whether or not the jury will be aided by the opinion of the witness").

■ Charvat's affidavit showed that she had a Bachelor of Science degree in psychology, sociology and education, a Masters of Education degree in counseling, and a Ph.D. degree in sociology; that she had been certified as a clinical sociologist for two years; and that she had been in private practice as a "mitigation specialist" for six years. Her description of the duties of a mitigation specialist indicates that her primary responsibility was to gather and coordinate penalty phase mitigation evidence and to testify "if necessary." Appellant does not claim that Charvat's inability to attend the trial prevented him from introducing the mitigation evidence which Charvat had gathered and coordinated. The decision as to the qualifications of an expert rests within the discretion of the trial judge. *Ford v. Commonwealth*, Ky., 665 S.W.2d 304, 309 (1983), *cert. denied*, 469 U.S. 984, 105 S.Ct. 392, 83 L.Ed.2d 325 (1984). The trial judge did not abuse his discretion in ruling that Charvat was insufficiently qualified to render expert opinions with respect to Appellant's mental condition at the time he committed these offenses.

■ Furthermore, Appellant did not offer to read Charvat's affidavit in lieu of her testimony; thus, the Commonwealth was not given the opportunity to foreclose the request for a continuance by consenting to the reading of her affidavit. RCr 9.04; *cf. Shirley v. Commonwealth*, Ky., 378 S.W.2d 816 (1964). But even if the posture of this case were otherwise, the grant or denial of a continuance is also within the sound discretion of the trial judge, RCr 9.04, and that discretion was not abused in this instance. *Williams v. Commonwealth*, Ky., 644 S.W.2d 335 (1982); *see generally Snodgrass v. Commonwealth*, Ky., 814 S.W.2d 579 (1991).

## IX. PENALTY PHASE ISSUES.

The Commonwealth · was permitted to use Appellant's prior conviction for a capital offense, *i.e.*, the Acker murder, as an aggravating circumstance authorizing imposition of the death penalty in this case. By the time of the 1996 trial, that conviction and sentence had been affirmed. *Sub nom., Epperson v. Commonwealth, supra.* However, Appellant's RCr 11.42 petition to vacate that sentence was still pending. Appellant claims (1) a prior conviction cannot be used as an aggravator during the pendency of a motion to vacate that conviction, and (2) he should have been permitted to collaterally attack that conviction during the penalty phase of this trial.

 A conviction which is still on appeal is not a final judgment and cannot be used as an aggravating circumstance. *Thompson v. Commonwealth,* Ky., 862 S.W.2d 871 (1993). However, a conviction which has been affirmed on appeal or for which the time for appeal has expired is a final judgment until and unless it is set aside. The pendency of a collateral attack by motion under RCr 11.42 does not preclude use of the conviction as an aggravating circumstance. *Cf. Melson v. Commonwealth,* Ky., 772 S.W.2d 631, 633 (1989). A petition for relief under RCr 11.42 must be filed in the court that imposed the sentence. RCr 11.42(1). Thus, Appellant could not collaterally attack his Letcher Circuit Court conviction during the penalty phase of his Laurel Circuit Court trial. *Cf. Webb v. Commonwealth,* Ky., 904 S.W.2d 226, 229 (1995); *McGuire v. Commonwealth, supra,* at 936–37.

 Appellant asserts that the trial judge erred in refusing to admit as penalty phase evidence the prior testimonies of Avery Johnson and Kay Daniels, neither of whom appeared at trial. Johnson apparently had been summoned pursuant to the Uniform Act to Secure the Attendance of Witnesses. KRS 421.240. Appellant claimed that a Tennessee judge had excused Johnson from attending the trial because of hardship, KRS 421.240(2), but

did not produce any documentation to prove that assertion (and has yet to do so). Nor could Appellant prove that Daniels was "unavailable" as defined in KRE 804(a) and *Crawley v. Commonwealth, supra,* at 931.

Johnson's 1987 testimony concerned Appellant's previous incarceration, and service as a jail trusty in an Anderson County, Tennessee, jail, to the effect that he worked in the kitchen, performed adequately, and got along with the other inmates and jail employees. At the 1996 retrial, a stipulation was read to the jury that while Appellant was incarcerated at the Brushy Mountain State Penitentiary in Tennessee, he got along well with the other inmates and guards. Kay Daniels was one of Appellant's ex-wives and the mother of his daughter, Crystal Dawn Hodge. Her 1987 testimony was that Appellant was a good father and that he wrote her frequently while he was incarcerated. Although Daniels did not appear at the 1996 trial, Crystal Dawn Hodge did appear and testified that Appellant was a good father. Furthermore, another ex-wife, Glenda Johnson, and another daughter, Sharon Hodge, both testified that Appellant was a good father. Thus, Appellant was not prejudiced by the absence of Johnson and Daniels, as their testimonies would have been merely cumulative.

 Appellant was not entitled to introduce evidence about the process of electrocution and/or the opinions of a minister and an ethicist as to the moral aspects of the death penalty. *Bowling v. Commonwealth, supra,* 942 S.W.2d at 306; *Smith v. Commonwealth, supra,* 734 S.W.2d at 453. The prosecutor did not "glorify" the victims during closing argument, but only depicted them as normal human beings who did not deserve to have their lives ended prematurely or in such brutal fashion. Nor is it improper to discuss victim impact evidence during the penalty phase closing argument. *Bowling v. Commonwealth, supra,* 942 S.W.2d at

303; *see also Payne v. Tennessee*, 501 U.S. 808, 825, 111 S.Ct. 2597, 2608, 115 L.Ed.2d 720 (1991); *cf. Bennett v. Commonwealth, supra*, at 325–26. Finally, while it would be improper in closing argument to attack the concept of mitigating circumstances, a prosecutor may question the validity and propriety of the specific evidence offered in mitigation in a particular case. *Tamme v. Commonwealth, supra*, at 39; *Sanborn v. Commonwealth*, Ky., 892 S.W.2d 542, 555 (1994), *cert. denied*, 516 U.S. 854, 116 S.Ct. 154, 133 L.Ed.2d 98 (1995). Here, the prosecutor argued to the jury that the fact that Appellant had been disciplined as a child did not mitigate his commission of two brutal murders as an adult. We regard this as fair comment, which is permitted in closing argument. *Halvorsen v. Commonwealth*, Ky., 730 S.W.2d 921, 925 (1986), *cert. denied*, 484 U.S. 970, 108 S.Ct. 468, 98 L.Ed.2d 407 (1987).

■ During the penalty phase argument, the prosecutor also reminded the jurors of Sherry Hamilton's testimony that Appellant "would kill again." Appellant characterizes this reference as improper use of a non-statutory aggravator ("future dangerousness") of which Appellant was not given pretrial notice as required by KRS 532.025(1)(a). The applicable language of the statute is as follows:

> Upon conviction of a defendant in cases where the death penalty may be imposed, a hearing shall be conducted. In such hearing, the judge shall hear *additional evidence* in extenuation, mitigation, and aggravation of punishment, including the record of any prior criminal convictions and pleas of guilty or pleas of nolo contendere of the defendant, or the absence of any prior conviction and pleas; provided, however, that only such *evidence in aggravation* as the state has made known to the defendant prior to his trial shall be admissible. (Emphasis added.)

■ Hamilton's testimony was not offered as "additional evidence" during the penalty phase of the trial. The evidence was elicited during the guilt phase *during cross-examination of Hamilton by defense counsel.* There was no objection to the testimony and no motion was made to strike it from the record. The Commonwealth is not required to give notice of aggravating evidence which it does not introduce. Once introduced, however, such evidence may be the subject of fair comment during closing argument. The United States Supreme Court "has approved the jury's consideration of future dangerousness during the penalty phase of a capital trial, recognizing that a defendant's future dangerousness bears on all sentencing determinations made in our criminal justice system." *Simmons v. South Carolina*, 512 U.S. 154, 162, 114 S.Ct. 2187, 2193, 129 L.Ed.2d 133 (1994) (per Justice Blackmun with three Justices concurring and three Justices concurring in result without disagreeing with this holding). In *Simmons*, as here, future dangerousness was not a statutory aggravator.

■ The jury was instructed on seven aggravating circumstances and they listed all seven in support of their death penalty verdicts. The instructions included as aggravating circumstances with respect to the murder of Edwin Morris that the offense was committed while the defendant was engaged in the commission of first-degree robbery of "Edwin Morris and/or Bessie Morris," or while the defendant was engaged in the first-degree burglary of "Edwin Morris and/or Bessie Morris." The instructions recited identical aggravating circumstances pertaining to the murder of Bessie Morris. Appellant did not contemporaneously object to the wording of any of these aggravating circumstances, but claims on appeal that they were in error because they did not specify that the victim of the murder must be the same person as the victim of the robbery and/or burglary. The statute does not so require. KRS 532.025(2)(a)2 only requires that the murder be committed while the offender was engaged in the commission of an ag-

gravating offense. But even if it were otherwise, the totality of the circumstances are not persuasive that death would not have been imposed but for this unpreserved alleged error. *Cosby v. Commonwealth, supra.*

■ The penalty phase instructions included the capital penalty verdict forms at 1 Cooper, *Kentucky Instructions to Juries (Criminal)* § 12.10 (4th ed. Anderson 1993) instead of the forms at § 12.10A of that treatise. As we stated in *Slaven v. Commonwealth,* Ky., 962 S.W.2d 845, 859–60 (1997), we prefer that the § 12.10A forms be used, but do not deem the use of the § 12.10 forms to be reversible error. *See also Foley v. Commonwealth,* Ky., 942 S.W.2d 876, 888–89 (1996); *cert. denied,* 522 U.S. 893, 118 S.Ct. 234, 139 L.Ed.2d 165 (1997); *Haight v. Commonwealth,* Ky., 938 S.W.2d 243 (1996), *cert. denied,* 522 U.S. 837, 118 S.Ct. 110, 139 L.Ed.2d 63 (1997); *Bussell v. Commonwealth,* Ky., 882 S.W.2d 111 (1994), *cert. denied,* 513 U.S. 1174, 115 S.Ct. 1154, 130 L.Ed.2d 1111 (1995). Here, the prosecutor carefully explained to the jury during his closing argument that they were required to list the aggravating circumstances only if they decided to impose a capital penalty.

Appellant's arguments that the death penalty is discriminatory and arbitrary, and that our statutory scheme does not provide constitutionally adequate guidance to capital sentencing juries, have been raised, considered and rejected by this Court on numerous occasions. *E.g., Tamme v. Commonwealth, supra,* at 40–41; *Bowling v. Commonwealth, supra,* 942 S.W.2d at 306; *Foley v. Commonwealth, supra,* 942 S.W.2d at 890; *Bussell v. Commonwealth, supra,* at 115; *Sanders v. Commonwealth,* Ky., 801 S.W.2d 665, 683 (1990), *cert. denied,* 502 U.S. 831, 112 S.Ct. 107, 116 L.Ed.2d 76 (1991). Our views with respect to those arguments remain unchanged.

■ The trial judge is not required to instruct the jury that aggravating cir-

cumstances must outweigh mitigating circumstances. *Bowling v. Commonwealth, supra,* 942 S.W.2d at 306; *Sanders v. Commonwealth, supra,* at 682–83; *Ice v. Commonwealth,* Ky., 667 S.W.2d 671, 678 (1984), *cert. denied,* 469 U.S. 860, 105 S.Ct. 192, 83 L.Ed.2d 125 (1984); *Smith v. Commonwealth,* Ky., 599 S.W.2d 900 (1980).

## X. MISCELLANEOUS CLAIMS OF ERROR.

■ Appellant claims he was prejudiced when the trial judge admonished defense counsel to "stop objecting" after counsel's fourth meritless objection during the first seven minutes of the prosecutor's penalty phase closing argument. While we do not condone the trial judge's momentary lapse into testiness, no prejudice resulted, since defense counsel ignored the judge's admonition and continued to register objections during the remainder of the prosecutor's argument. Even if that were not so, we have reviewed all claims of error raised by Appellant and have found no impropriety with respect to the prosecutor's argument. KRS 532.075(2); *Ice v. Commonwealth, supra,* at 674. Appellant also makes a general claim of prosecutorial misconduct, mostly a repeat of other claims of error which have been separately addressed and rejected in this opinion. To the extent that misconduct is attributed to the prosecutor's closing argument, we repeat what we have often said before: "A prosecutor may comment on tactics, may comment on evidence, and may comment as to the falsity of a defense position." *Slaughter v. Commonwealth,* Ky., 744 S.W.2d 407, 412 (1987), *cert. denied,* 490 U.S. 1113, 109 S.Ct. 3174, 104 L.Ed.2d 1036 (1989). The prosecutor did not exceed the bounds of fair comment in either of his closing arguments.

■ The Court's use of videotaped records pursuant to CR 98 instead of stenographic transcripts did not prejudice Appellant's right to appeal. *Foster v.*

*Kassulke,* 898 F.2d 1144, 1147–48 (6th Cir. 1990).

No cumulative error occurred which requires reversal of this case. *Compare Funk v. Commonwealth,* Ky., 842 S.W.2d 476 (1992).

## XI. KRS 532.075(3) REVIEW.

Pursuant to KRS 532.075(3), we have reviewed this record and concluded that the sentence of death was not imposed under the influence of passion, prejudice, or any other arbitrary factor. There was ample evidence to support the finding of the aggravating factors concerning which the jury was instructed. We have also reviewed all cases decided since 1970 in which the death penalty was imposed. We have particularly considered those in which a defendant was sentenced to death for multiple intentional murders, *viz: Tamme v. Commonwealth,* Ky., 973 S.W.2d 13 (1998), *cert. denied,* 525 U.S. 1153, 119 S.Ct. 1056, 143 L.Ed.2d 61 (1999) (two murders); *Baze v. Commonwealth,* Ky., 965 S.W.2d 817 (1997) (two murders of law enforcement officers); *Foley v. Commonwealth,* Ky., 953 S.W.2d 924 (1997), *cert. denied,* 523 U.S. 1053, 118 S.Ct. 1375, 140 L.Ed.2d 522 (1998) (four murders); *Bowling v. Commonwealth,* Ky., 942 S.W.2d 293 (1997), *cert. denied,* 522 U.S. 986, 118 S.Ct. 451, 139 L.Ed.2d 387 (1997) (two murders, burglaries and robberies); *Foley v. Commonwealth,* Ky., 942 S.W.2d 876 (1996), *cert. denied,* 522 U.S. 893, 118 S.Ct. 234, 139 L.Ed.2d 165 (1997) (two murders); *Haight v. Commonwealth,* Ky., 938 S.W.2d 243 (1996), *cert. denied,* 522 U.S. 837, 118 S.Ct. 110, 139 L.Ed.2d 63 (1997) (two murders and robbery); *Bowling v. Commonwealth,* Ky., 873 S.W.2d 175 (1993), *cert. denied,* 513 U.S. 862, 115 S.Ct. 176, 130 L.Ed.2d 112 (1994) (two murders); *Taylor v. Commonwealth,* Ky., 821 S.W.2d 72 (1990), *cert. denied,* 502 U.S. 1100, 112 S.Ct. 1185, 117 L.Ed.2d 428 (1992) (two murders, kidnapping, robbery and sodomy); *Sanders v. Commonwealth,* Ky., 801 S.W.2d 665 (1990), *cert. denied,* 502 U.S. 831, 112 S.Ct. 107, 116 L.Ed.2d 76 (1991) (two murders and robbery); *Simmons v.. Commonwealth,* Ky., 746 S.W.2d 393 (1988), *cert. denied,* 489 U.S. 1059, 109 S.Ct. 1328, 103 L.Ed.2d 596 (1989) (three murders, kidnapping and rape); *Smith v. Commonwealth,* Ky., 734 S.W.2d 437 (1987), *cert. denied,* 484 U.S. 1036, 108 S.Ct. 762, 98 L.Ed.2d 778 (1988) (four murders); *Halvorsen and Willoughby v. Commonwealth,* Ky., 730 S.W.2d 921 (1986), *cert. denied,* 484 U.S. 970, 108 S.Ct. 468, 98 L.Ed.2d 407 (1987) and *cert. denied,* 484 U.S. 982, 108 S.Ct. 496, 98 L.Ed.2d 495 (1987) (two murders); *Bevins v. Commonwealth,* Ky., 712 S.W.2d 932 (1986), *cert. denied,* 479 U.S. 1070, 107 S.Ct. 963, 93 L.Ed.2d 1010 (1987) (five murders); *Matthews v. Commonwealth,* Ky., 709 S.W.2d 414 (1985), *cert. denied,* 479 U.S. 871, 107 S.Ct. 245, 93 L.Ed.2d 170 (1986) (two murders and burglary); *Skaggs v. Commonwealth,* Ky., 694 S.W.2d 672 (1985), *cert. denied,* 476 U.S. 1130, 106 S.Ct. 1998, 90 L.Ed.2d 678 (1986) (two murders, robbery and burglary); *Harper v. Commonwealth,* Ky., 694 S.W.2d 665 (1985), *cert. denied,* 476 U.S. 1178, 106 S.Ct. 2906, 90 L.Ed.2d 992 (1986) (two murders for profit); *White v. Commonwealth,* Ky., 671 S.W.2d 241 (1983), *cert. denied,* 469 U.S. 963, 105 S.Ct. 363, 83 L.Ed.2d 299 (1984) (three murders, robbery and burglary); and *Boyd v. Commonwealth,* Ky., 550 S.W.2d 507 (1977) (two murders, but sentence reduced to life in prison due to the United States Supreme Court's decision in *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976)). On the basis of this review, we have determined that the sentence of death in this case is not excessive or disproportionate to the penalty imposed in similar cases, considering both the crimes and the defendant.

For the reasons stated in this opinion, the judgments of conviction and sentences imposed by the Laurel Circuit Court are affirmed.

LAMBERT, C.J.; GRAVES, JOHNSTONE, KELLER and WINTERSHEIMER, JJ., concur.

STUMBO, J., not sitting.