Larry OSBORNE, Appellant,

v.

COMMONWEALTH of Kentucky,
Appellee.

No. 1999–SC–0124–MR.

Supreme Court of Kentucky.

April 26, 2001.

M. Gail Robinson, Frankfort, Timothy G. Arnold, Assistant Public Advocate, Department of Public Advocacy, Frankfort, for appellant.

A.B. Chandler, III, Attorney General, State Capitol, Frankfort, Elizabeth A. Heilman, Anitria M. Franklin, Assistant Attorneys General, Office of Attorney General, Criminal Appellate Division, Frankfort, for appellee.

COOPER, Justice.

## I. FACTS.

Sometime after 12:30 a.m. on December 14, 1997, Sam and Lillian Davenport, ages 82 and 76 respectively, died in a fire that consumed their residence on highway 1804 in Whitley County, Kentucky. Forensic testing revealed the presence of an accelerant in the room where the bodies were found and on a portion of Mrs. Davenport's clothing, indicating the fire had been intentionally set. Autopsies revealed that each victim had sustained a cranial injury consistent with blunt force trauma, but that the cause of death in each instance was smoke inhalation.

Earlier that same evening, Appellant Larry Osborne had borrowed a "DS80" motorcycle (described by some witnesses as a "dirt bike") from Dustin Oyer, a visitor at the Osborne residence, and had driven it from his residence on Burke Hollow Road to highway 1804, then south on 1804 past the residence of Sam and Lillian Davenport to the residence of Scott Duncan on highway 25. Appellant, Duncan, Sarah Tissott and Joe Reid, age fifteen, then proceeded back north on 1804 past the Davenport residence to the residence of William Nix and Irene Ramsey. Appellant drove the motorcycle with Reid riding on the back as a passenger. Duncan and Tissott followed in a pickup truck. Appellant and Reid left the Nix/Ramsey residence sometime after midnight and drove south on 1804 past the Davenport residence to Jellico, where Reid lived with his grandmother, Mildred McLemore. Appellant and Reid arrived at the McLemore residence at approximately 12:55 a.m. To return to his home on Burke Hollow Road, Appellant was required to again drive north on 1804 past the Davenport residence. Mildred McLemore testified that Appellant telephoned his mother from her residence and that she overheard him say: "Mom, me and Joe heard glass breaking down here at a house on the road. Come and follow me home. I'm scared." McLemore then watched as Appellant drove the motorcycle to a nearby store referred to alternatively as "Ray's market" and the "Red Ace."

Dustin Oyer testified that he was asleep at the Osborne residence when Patricia Osborne awakened him and asked him to accompany her to meet Appellant.

Pat woke me up, said that we're—well, could you ride to the Red Ace with me? Larry's waiting on me on your motorcycle. We rode up there. Larry said I heard some glass shattering around the house, the Davenports'

house. The house wasn't burning when we come through. We come back through. We got at her house. Then she dialed 911, the law, or something like that and said that her son heard glass breaking around the house, the Davenports' house. And then somebody called her back. It could have been the law that called her back. I don't know. But somebody called her back and her and Larry got in the car and went down to the Davenports' house. She said it was the law that called them and told them to come to the house. They needed questions from them or something.

The Whitley County "911" dispatcher testified that at 1:18 a.m. a person identifying herself as "Pat Osborne" called to report that her son had heard glass breaking when he drove past the Davenport residence. The caller gave both her name and her telephone number to the dispatcher. At trial, the Commonwealth introduced an audiotape recording of the entire "911" telephone conversation. The dispatcher then contacted Kentucky State Police Trooper Sam Durham who arrived at the Davenport residence at 1:36 a.m. to find it engulfed in flames. Durham unsuccessfully attempted to enter the burning home, then directed the dispatcher to call the fire department. Also at Durham's request, the dispatcher called the Osborne residence and asked Appellant and his mother to report to the scene. Upon arrival, Appellant told Durham that he and Reid had driven by the Davenport residence on a motorcycle and had heard "the crash of glass breaking."

Appellant did not testify at trial. However, in addition to the oral statement made to Trooper Durham, he gave the following written statement to Kentucky State Police Detective Gary Lane on the morning after the murders:

Me and Joe Reid were riding a motorcycle past Mr. Davenport's when I heard a glass breaking. We then went to Joe Reid's residence where I called my mom, Pat Osborne, to pick me up. I drove the motorcycle home while Mom followed. We seen nothing on the way back through. This happened on 12–14–97 approx 0130 hrs.

Joe Reid gave Detective Lane the following written statement:

On 12–14–97 approx 0100 hrs me and Larry Osborne were riding a trail bike past Davenport residence. I heard some glass breaking. I did not see anybody around the residence.

On December 31, 1997, Reid submitted to a polygraph examination. Upon being told that he had failed the examination, Reid "confessed" the following sequence of events to Detective Lane: After leaving the Nix/Ramsey residence, Appellant told Reid he was going to borrow some money from the Davenports to purchase a horse. Appellant drove the motorcycle to the Davenport residence with Reid riding on the back. Appellant got off the motorcycle and proceeded to the rear of the house, then returned with a wooden lawn chair and placed it under a window. When Reid realized that Appellant was going to break into the house, he urged Appellant not to do so. Reid then attempted to start the motorcycle, but the chain fell off. Appellant broke the window and entered the residence. Reid put the chain back on the motorcycle and drove down the road, but returned to find Appellant waiting for him outside the Davenport residence with a "pocketful" of money. Reid claimed he heard no screams or gunshots and that Appellant did not have a gun. Appellant drove Reid home on the motorcycle.

On January 21, 1998, Reid testified before a Whitley County grand jury substantially as follows: Appellant picked him up at Scotty Duncan's residence and drove him to the Nix/Ramsey residence on a motorcycle that Appellant had borrowed from Dustin "Whittier" (presumably Oyer). At about 10:30 – 11:00 p.m., Appellant told Reid he was going to get some money for a horse and was absent from the Nix/Ramsey residence for thirty to thirty-five minutes. Reid speculated that Appellant went to his own home either to obtain a weapon or to enlist his mother's assistance in robbing the Davenports. Reid and Appellant left the Nix/Ramsey residence at approximately 12:15 – 12:20 a.m. with Appellant driving the motorcycle and Reid riding on the back. Upon arrival at the Davenport residence, Appellant stopped, got off the motorcycle, and told Reid he was going to borrow some money from the Davenports. Appellant had a handgun. Appellant went to the rear of the Davenport house and Reid attempted to drive the motorcycle "down the road," but the chain came off. Reid then heard glass breaking and two gunshots from the rear of the house. Appellant returned from the rear of the house and placed a lawn chair under a window, then broke out the window glass with his forearm and entered the residence. Reid heard more glass breaking, another gunshot, and a woman screaming inside the residence. Appellant came out of the house with money in his pockets and the gun up his sleeve, got back on the motorcycle, and drove Reid to his home. Appellant told Reid that his mother would help him burn the Davenports' residence and threatened to beat Reid if he "ratted" on him.

In response to a question from a grand juror about the chain incident, Reid testified that he had previously worked on Oyer's motorcycle, but had failed to properly tighten the chain; and when he attempted to push the motorcycle, the chain fell off. He put or "threw" the chain back

on the motorcycle, but made no attempt to tighten it, then pushed the motorcycle forward to see if the chain would stay on. The following colloquy then occurred:

Juror: Were you planning to leave him?

Reid: I was going to drive it.

Juror: While he was in the house?

Reid: Yeah.

The Whitley County grand jury indicted Appellant on two counts of murder and one count each of robbery in the first degree, burglary in the first degree, and arson in the first degree. Patricia Osborne was indicted on two counts of complicity to murder and one count each of arson in the first degree and complicity to burglary in the first degree. The Commonwealth's theory was that Appellant forcibly entered the Davenport residence and assaulted and robbed the victims; and that he and his mother later returned to the residence and set the fire to cover up the earlier crimes. The joint indictments of Appellant and his mother were severed for purposes of trial. Appellant was subsequently convicted of all charges and sentenced to death for each murder, to life in prison for first-degree arson, and to twenty years each for first-degree burglary and first-degree robbery. He appeals to this Court as a matter of right. Ky. Const. § 110(2)(b); KRS 532.075. We reverse and remand because of the improper admission of hearsay evidence during Appellant's trial. We will only address those additional issues affecting retrial or likely to recur upon retrial.

## II. JUVENILE TRANSFER PROCEEDINGS.

■ Appellant was seventeen years old when these offenses occurred, thus the charges against him were first brought in the juvenile division of the Whitley District Court. KRS 635.010. The juvenile complaint/petition charged Appellant with two murders, first-degree arson and first-degree robbery, but not first-degree burglary. Following a transfer hearing held pursuant to KRS 640.010, Appellant was transferred to the Whitley Circuit Court as a youthful offender. Appellant claims it was error to indict and convict him of first-degree burglary, or to use that offense as an aggravating circumstance authorizing the death penalty, since he had not been charged with that offense in juvenile court; thus, the district judge had no authority to transfer that offense to circuit court. (The transfer order recites that Appellant was charged with two murders, first-degree arson and first-degree burglary, but not first-degree robbery.) However, under the statutory scheme for youthful offenders, it is the offender that is transferred to circuit court, not the offense.

> [T]he *child* may be transferred to Circuit Court, and if the *child* is transferred the District Court shall issue an order transferring the *child* as a youthful offender and shall state on the record the reasons for the transfer. The *child* shall then be proceeded against in the Circuit Court as an adult, except as otherwise provided in this chapter.

KRS 640.010(2)(c) (emphasis added).

Appellant's reliance on KRS 640.010(3) is misplaced. That statute requires that the child be returned to juvenile court if the grand jury does not find probable cause to indict the child as a youthful offender under KRS 635.020(2), (3), (5), (6), (7) and (8), but does find probable cause to indict the child for another criminal offense. If the grand jury finds probable cause to indict the child as a youthful offender, KRS 640.010(3) does not preclude it from indicting the child for other offenses arising out of the same course of conduct that gave rise to the offense that caused the child to be transferred to circuit court. In fact, the provisions of KRS

610.015(2) and KRS 635.020(8) anticipate that other offenses arising out of the same course of conduct can be charged and adjudicated in circuit court after transfer.

■ Relying on *Harden v. Commonwealth*, Ky.App., 885 S.W.2d 323 (1994), Appellant also complains that the transfer order did not contain written findings with respect to each of the eight factors enumerated in KRS 640.010(2)(b). When *Harden* was decided, KRS 640.010(2)(c) provided:

> If, following the completion of the preliminary hearing, *the court is of the opinion, after considering the factors enumerated in subsection (b) of this section, that the child should be transferred to circuit court,* the court shall issue an order transferring the child as a youthful offender *and shall state on the record the reasons for the transfer . . . .* (Emphasis added.)

The transfer order in *Harden* stated the reasons for the transfer, but did not recite that the district judge had considered all the factors enumerated in KRS 640.010(2)(b). The Court of Appeals held that this omission required reversal and remanded the case to the juvenile court for a new transfer hearing. *Id.* at 325. Subsequent to the transfer at issue in *Harden,* KRS 640.010(2)(c) was amended [1] so that it now reads:

> If, following the completion of the preliminary hearing, *the District Court finds, after considering the factors enumerated in paragraph (b) of this subsection, that two (2) or more of the factors specified in paragraph (b) of this subsection are determined to favor transfer,* the child may be transferred to Circuit Court, and if the child is transferred the District Court shall issue an order transferring the child as a youthful offender

*and shall state on the record the reasons for the transfer.* (Emphasis added.)

Here, the transfer order recites that "all the factors" (presumably those enumerated in KRS 640.010(2)(b)) were considered and that three of those factors were found to favor transfer: (1) the seriousness of the offenses; (2) the offenses were committed against both persons and property; and (3) Appellant's age made it unlikely that reasonable rehabilitation could be accomplished by use of juvenile services and facilities. Thus, the transfer order satisfied the requirements of the statute and sufficed to vest the circuit court with jurisdiction to adjudicate the charges for which Appellant was subsequently indicted and convicted.

### III. HEARSAY: GRAND JURY TESTIMONY.

■ Joe Reid died by accidental drowning on July 8, 1998. Appellant's trial began on November 23, 1998. At trial, Detective Lane was allowed to read to the jury a transcript of Reid's January 21, 1998 grand jury testimony. Since that testimony was offered to prove the truth of its content, *i.e.,* that Appellant robbed and killed the Davenports and burglarized and burned their residence, the testimony was clearly hearsay and inadmissible unless it fell within an exception to the hearsay rule. KRE 801(c), KRE 802. It is immaterial that Appellant was permitted to impeach Reid's grand jury testimony by cross-examining Lane about Reid's prior inconsistent statements. Impeachment of incompetent evidence is no substitute for its exclusion.

The trial judge held Reid's grand jury testimony admissible under the hearsay exception for statements against interest.

---

1. 1996 Ky.Acts, ch. 358, § 55, eff. July 15, 1997.

KRE 804(b)(3). That Rule provides an exception for:

A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability ... that a reasonable person in the declarant's position would not have made the statement unless believing it to be true. A statement tending to expose the declarant to criminal liability is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

The Commonwealth's argument in response to Appellant's motion to suppress was that Reid's statement that he put the chain back on the motorcycle exposed him to criminal liability for criminal facilitation. KRS 506.080(1) provides:

A person is guilty of criminal facilitation when, acting with knowledge that another person is committing or intends to commit a crime, he engages in conduct which knowingly *provides such person with means or opportunity for the commission of the crime and which in fact aids such person to commit the crime.* (Emphasis added.)

Obviously, Reid's act of putting the chain back on the motorcycle did not provide Appellant with the means or opportunity to rob and kill the Davenports or to burglarize and burn their residence. Thus, on appeal, the Commonwealth argues that Reid's statement exposed him to criminal liability for hindering prosecution or apprehension. KRS 520.120 (hindering in the first degree) and KRS 520.130 (hindering in the second degree) both provide in pertinent part:

A person is guilty of hindering prosecution or apprehension ... when, with the intent to hinder the apprehension, prosecution, conviction or punishment of another [who] is being sought in connection with the commission of a [criminal] offense ... he *renders assistance* to such person. (Emphasis added.)

KRS 520.110(1) defines "renders assistance" to include, *inter alia:* "Provid[ing] such person with money, *transportation,* weapon, disguise or other means of avoiding discovery or apprehension." (Emphasis added.) Even assuming Reid put the loose chain back on the motorcycle's cogs with the intent to hinder Appellant's apprehension or prosecution, as opposed to (as his testimony suggested) facilitating his own departure from the scene, the fact remains that Reid did not "provide" Appellant with the "transportation" that Appellant supposedly used to avoid discovery or apprehension. The motorcycle belonged not to Reid, but to Dustin Oyer. Presumably, if Reid had not slipped the loose chain back on the motorcycle, Appellant could have done so himself. This simple act was insufficient to expose Reid to criminal liability for hindering prosecution or apprehension by providing transportation to one being sought in connection with a criminal offense. The prosecutor obviously agreed; for despite the fact that Reid received no "deal" in exchange for his grand jury testimony, no effort was made during the interim between that testimony and Reid's death to charge him with any criminal offense premised upon his testimony. There is also a complete absence of any corroboration, as required by KRE 804(b)(3), either that the chain came off the motorcycle or that Reid put it back on.

But even if Reid's description of the chain incident had been admissible as a statement against his own penal interest, such would not have authorized the wholesale admission of his entire grand jury testimony, the balance of which served only to incriminate Appellant. The United States Supreme Court has held that a

"statement" against penal interest is "a single declaration or remark," not the entire "report or narrative" within which it is contained.

> [T]he most faithful reading of Rule 804(b)(3) is that it does not allow admission of non-self-inculpatory statements, even if they are made within a broader narrative that is generally self-inculpatory. The district court may not just assume for purposes of Rule 804(b)(3) that a statement is self-inculpatory because it is part of a fuller confession, and this is especially true when the statement implicates someone else.

*Williamson v. United States*, 512 U.S. 594, 599, 600–01, 114 S.Ct. 2431, 2434, 2435, 129 L.Ed.2d 476 (1994); *see also Vincent v. Seabold*, 226 F.3d 681, 687, 689 (6th Cir. 2000). Although the hearsay rule and many of its recognized exceptions predate the United States Constitution,[2] the application of those exceptions clearly implicates the Confrontation Clause of the Sixth Amendment, *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), made applicable to the states by the Fourteenth Amendment. *Pointer v. Texas*, 380 U.S. 400, 403, 85 S.Ct. 1065, 1068, 13 L.Ed.2d 923 (1965). Thus, we are bound by the United States Supreme Court's interpretation of what constitutes an admissible out-of-court "statement" under the hearsay exception for statements against penal interest. *Cf. Moseley v. Commonwealth*, Ky., 960 S.W.2d 460, 462 (1997). Pursuant to *Williamson*, each statement within the broader narrative must be examined individually to determine whether it is, in fact, self-inculpatory. If not, it is inadmissible. *Gabow v. Commonwealth*, Ky., 34 S.W.3d 63, 78 n. 12 (2000). Here,

the Commonwealth can identify but one isolated remark in the broader narrative of Reid's grand jury testimony as even arguably against Reid's own penal interest. The remainder of his testimony was self-exculpatory, *i.e.*, that he was an innocent bystander to crimes committed by Appellant. *Moore v. Commonwealth*, Ky., 282 S.W.2d 613, 615 (1955) ("mere presence at the scene of a crime is not sufficient to attach guilt").

We also reject the novel theory advanced during oral argument that any statement made under oath is a "potential" statement against penal interest because, if untrue, the statement would subject the declarant to prosecution for perjury. If that were so, every prior statement made under oath by an unavailable witness would be automatically admissible against any person inculpated by that statement. There is, of course, a separate hearsay exception for former testimony; but that exception permits the admission of prior sworn testimony only if the party against whom the testimony is now offered had an opportunity when it was given to develop the testimony by direct, cross, or redirect examination. KRE 804(b)(1). Obviously, Appellant never had an opportunity to cross-examine Reid's grand jury testimony.

The improper admission of the grand jury testimony of Joe Reid requires reversal for a new trial at which none of Reid's statements inculpating Appellant shall be admitted.

## IV. HEARSAY: "911" AUDIOTAPE.

■ Appellant asserts that the audiotape of Patricia Osborne's telephone call to

---

2. The exception for statements against penal interest, however, is of more recent origin. *See Chambers v. Mississippi*, 410 U.S. 284, 298–301, 93 S.Ct. 1038, 1047–49, 35 L.Ed.2d 297 (1973); *Crawley v. Commonwealth*, Ky., 568 S.W.2d 927, 930–31 (1978), *cert. denied*, 439 U.S. 1119, 99 S.Ct. 1028, 59 L.Ed.2d 79 (1979), *limited on other grounds, Martin v. Commonwealth*, Ky., 13 S.W.3d 232 (1999); *Thomas v. State*, 580 N.E.2d 224 (Ind.1991).

the "911" dispatcher should have been excluded as hearsay, because Mrs. Osborne did not testify at trial and her statements to the dispatcher could not reasonably be characterized as "excited utterances" under KRE 803(2).[3] However, an out-of-court statement is not hearsay if it is relevant to prove only that the statement was made and not for the truth of the matter asserted. KRE 801(c). Obviously, the Commonwealth did not introduce the audiotape to prove the truth of Patricia Osborne's assertion that Appellant heard glass breaking when he drove past the Davenport residence. That was Appellant's theory of the case, not the Commonwealth's. It was the Commonwealth's theory that the statements made during the "911" call were false and, thus, proved a scheme by Appellant and his mother to divert police attention away from themselves to an unknown perpetrator. As such, the statements made during the "911" call had a relevancy existing without regard to the truth of the assertions. *Perdue v. Commonwealth*, Ky., 916 S.W.2d 148, 156 (1995), *cert. denied*, 519 U.S. 855, 117 S.Ct. 151, 136 L.Ed.2d 96 (1996); R. Lawson, *The Kentucky Evidence Law Handbook* § 8.05, at 367–68 (3d ed. Michie 1993).

■ Coughing is heard in the background of the audiotape of the "911" call. The prosecutor speculated during closing argument that it was Appellant coughing smoke and soot from the fire out of his lungs. Mrs. Osborne made several aside comments during the "911" call from which it could be inferred that Appellant was present and providing her with information at the time. Though dubious and obviously speculative, the prosecutor's character-

ization of the background coughing was not such an unreasonable inference from the evidence as to constitute reversible error. *Tamme v. Commonwealth*, Ky., 973 S.W.2d 13, 39 (1998), *cert. denied*, 525 U.S. 1153, 119 S.Ct. 1056, 143 L.Ed.2d 61 (1999); *Bills v. Commonwealth*, Ky., 851 S.W.2d 466, 473 (1993).

## V. CRIME ROUTE VIDEO.

■ Detective Lane introduced a videotape purporting to show the routes and distances supposedly traveled by Appellant and his mother on the night in question and the approximate times it took to travel those distances. The Commonwealth's theory was that Appellant and Reid first traveled from the Nix/Ramsey residence south on highway 1804 to the Davenport residence where Appellant robbed the Davenports, then from the Davenport residence south on 1804 to its merger with highway 25, then south on highway 25 to Jellico, then up Kentucky Hill to Mildred McLemore's residence; that Appellant then drove down Kentucky Hill to Ray's market on highway 25 where he met his mother; that Appellant and his mother proceeded back to highway 1804 and north to the Davenport residence where they set the fatal fire, then continued north on 1804 to Burke Hollow Road where they turned right and proceeded to their own residence. Appellant agrees this was the route he traveled that night, but disagrees that he ever stopped at the Davenport residence.

Detective Lane used a video camera mounted inside his police cruiser to videotape the routes while he drove from point to point at a speed of forty miles per hour, marking the travel times with a stopwatch.

---

**3.** Appellant does not contest the authentication of the "911" call. Mrs. Osborne gave both her name and telephone number to the dispatcher, and he was able to reach her later by return call to that same number. *Cf.* KRE 901(b)(6), compare *Crowe v. Commonwealth*, Ky., 38 S.W.3d 379 (2001).

However, he did not videotape the so-called "crime route" in the sequence in which it occurred. The videotape starts at the Davenport residence, then proceeds north on 1804 to Burke Hollow Road, then to the Osborne residence. Lane testified that the travel time from the Davenport residence to the Osborne residence was one minute and fifty-three seconds. The next scene on the videotape is the Nix/Ramsey residence, but there is no depiction of any route to or from that location. The videotape then switches to the McLemore residence on Kentucky Hill, from where it proceeds to Ray's market on highway 25, then to highway 1804 and back to the Davenport residence. Detective Lane testified that the travel time from the McLemore residence to the Davenport residence was two minutes.

Appellant asserts three errors with respect to the admission of the crime route video: (1) the video was made during daylight hours whereas the actual events occurred at night; (2) there was no evidence as to how fast Appellant was driving the motorcycle on the night in question; and (3) the transposition of the Nix/Ramsey residence from the Osborne residence on the videotape created an inference that they are located next to each other when, in fact, they are several miles apart.

Presumably, the purpose of the crime scene video was to demonstrate the relatively short distances and travel times between locations crucial to this case in order to prove that it was possible for Appellant and his mother to drive from Ray's market to the Davenport residence, set the fire, and arrive at their own residence by 1:18 a.m., when Patricia Osborne made her "911" call. Thus, it is of no consequence that the video was made during daylight rather than at night, or that the motorcycle may have been going faster or slower than Lane's police cruiser. Similar to the posed photograph described in *Gorman v. Hunt*, Ky., 19 S.W.3d 662 (2000), the crime scene video simply demonstrated the plausibility of the Commonwealth's theory of the case. While the transposition to the Nix/Ramsey residence from the Osborne residence may have been confusing, Lane clarified on cross-examination that they were not located near each other and that the Nix/Ramsey residence was located further north on highway 1804. Though it may have been preferable to have deleted the portrayal of the Nix/Ramsey residence from the videotape, that request was not made at trial. We conclude that the trial judge did not abuse his discretion in admitting the crime scene video into evidence. *Id.* at 669.

## VI. GLASS PARTICLES.

■ Glass fragments found at seven different locations on the Davenport property were sent to the Kentucky State Police Crime Laboratory for forensic examination, as was the clothing Appellant was wearing on the night the crimes were committed. Scrapings of Appellant's clothing produced numerous small glass particles, but none matched the glass fragments found on the Davenport property. Appellant complains that the evidence that glass particles were found on his clothing should have been excluded as irrelevant, since those particles did not match the glass fragments gathered from the crime scene. Appellant did not object to the admission of this evidence at trial. Since the evidence was more exculpatory than inculpatory, we regard this omission as a legitimate trial tactic. *Sanders v. Commonwealth*, Ky., 801 S.W.2d 665, 668 (1990), *cert. denied*, 502 U.S. 831, 112 S.Ct. 107, 116 L.Ed.2d 76 (1991); *Cosby v. Commonwealth*, Ky., 776 S.W.2d 367, 369 (1989), *cert. denied*, 493 U.S. 1063, 110 S.Ct. 880, 107 L.Ed.2d 963 (1990), *overruled on other grounds, St. Clair v.*

*Roark,* Ky., 10 S.W.3d 482 (1999). In fact, counsel for Appellant literally "pounced" on the mismatch during cross-examination of the forensic analyst who testified to it.

At oral argument, Appellant's primary complaint was that the prosecutor, in his closing argument, cited the presence of glass particles on Appellant's clothing as evidence of his guilt. The prosecutor did not claim that the particles matched the glass fragments gathered from the crime scene and forwarded to the crime laboratory. Clearly, there was a lot of broken glass at the crime scene. The absence of a match between the glass particles on Appellant's clothing and the glass fragments sent to the crime laboratory does not eliminate the possibility that the glass on Appellant's clothing came from the Davenport residence. It just eliminates the possibility that the glass on Appellant's clothing came from the same objects as the glass fragments sent to the crime laboratory. The prosecutor did not misstate the evidence with respect to the glass particles.

## VII. INSTRUCTIONS.

■ The trial judge instructed the jury on alternative theories of intentional and wanton murder, KRS 507.020(1)(a) and (b), and on second-degree manslaughter, KRS 507.040, as a lesser included offense. Appellant asserts error in the trial judge's failure to further instruct the jury on first-degree manslaughter (intent to injure, but not to kill), KRS 507.030(1)(a), and reckless homicide, KRS 507.050, as lesser included offenses. An instruction on a lesser included offense is appropriate if, and only if, on the given evidence a reasonable juror could entertain a reasonable doubt of the defendant's guilt on the greater charge, but believe beyond a reasonable doubt that the defendant is guilty of the lesser offense. *Skinner v. Com-*

*monwealth,* Ky., 864 S.W.2d 290, 298 (1993); *Luttrell v. Commonwealth,* Ky., 554 S.W.2d 75, 78 (1977).

Appellant's reliance on *Commonwealth v. Wolford,* Ky., 4 S.W.3d 534 (1999) is misplaced. In *Wolford,* shots were heard and the victims were found dead from gunshot wounds. The evidence against the various defendants was entirely circumstantial. We held that "where ... the evidence is purely circumstantial and does not conclusively establish [the defendant's] state of mind at the time he killed the victim, it is appropriate to instruct on all degrees of homicide and leave it to the jury to sort out the facts and determine what inferences and conclusions to draw from the evidence." *Id.* at 539–40. The Davenports died not from injuries sustained during the robbery, but from smoke inhalation sustained as a result of the arson. Reid testified that Appellant intended to set the fire; an accelerant was found at the scene and on the clothing of one of the victims. We agree with the trial judge that such evidence does not support an inference that Appellant set the fire with an intent to merely injure the victims, *i.e.,* first-degree manslaughter, or that a reasonable person would have failed to perceive the risk that if he set fire to an occupied residence, the occupants would be killed, *i.e.,* reckless homicide.

## VIII. MISCELLANEOUS.

■ We find no error in the trial judge's failure to change venue. Though many prospective jurors had heard about the case, we are unable to conclude that public opinion in Whitley County was so aroused against Appellant as to preclude a fair trial. *Kordenbrock v. Commonwealth,* Ky., 700 S.W.2d 384, 387 (1985), *cert. denied,* 476 U.S. 1153, 106 S.Ct. 2260, 90 L.Ed.2d 704 (1986), *habeas granted in part on other grounds, Kordenbrock v. Scroggy,*

919 F.2d 1091 (6th Cir.1990), *cert. denied,* 499 U.S. 970, 111 S.Ct. 1608, 113 L.Ed.2d 669 (1991). "A trial judge's decision not to change venue 'is given great weight because he is present in the county and presumed to know the situation.'" *Hodge v. Commonwealth,* Ky., 17 S.W.3d 824, 835 (2000) (quoting *Nickell v. Commonwealth,* Ky., 371 S.W.2d 849, 850 (1963), *cert. denied,* —— U.S. ——, 121 S.Ct. 581, 148 L.Ed.2d 498 (2000)).

Appellant repeats the litany of issues raised in every death penalty appeal, *e.g.,* the death penalty is unconstitutional, the jury should have been instructed on "residual doubt," that aggravating factors must outweigh mitigating factors, and that unanimity is not required when considering mitigating factors, etc. We have consistently held otherwise and see no reason to repeat our reasons for rejecting these arguments here. *See, e.g., Tamme v. Commonwealth, supra; McQueen v. Parker,* Ky., 950 S.W.2d 226 (1997); *Bowling v. Commonwealth,* Ky., 942 S.W.2d 293 (1997), *cert. denied,* 522 U.S. 986, 118 S.Ct. 451, 139 L.Ed.2d 387 (1997).

■ Finally, Appellant asserts that absent Joe Reid's grand jury testimony, there was insufficient competent evidence to convict him of these crimes and that to retry him would constitute double jeopardy. However, the issue is not whether Appellant would have been entitled to a directed verdict of acquittal absent the improperly admitted evidence, but whether the evidence that was, in fact, admitted was sufficient to take the case to the jury. *Lockhart v. Nelson,* 488 U.S. 33, 109 S.Ct. 285, 102 L.Ed.2d 265 (1988). We conclude that it was. *Commonwealth v. Benham,* Ky., 816 S.W.2d 186 (1991). It is not our province to determine now whether the Commonwealth can produce sufficient competent evidence to avoid a directed verdict of acquittal upon retrial.

Accordingly, the judgments of conviction and sentences imposed by the Whitley Circuit Court are reversed, and this case is remanded for a new trial in accordance with the content of this opinion.

LAMBERT, C.J., JOHNSTONE, STUMBO and WINTERSHEIMER, JJ., concur.

KELLER, J., concurs by separate opinion in which GRAVES, J., joins.

KELLER, Justice, concurring.

I agree with the majority that we must reverse Osborne's convictions because the trial court allowed the Commonwealth to introduce abundant inadmissible hearsay statements when it permitted the prosecution to read Joe Reid's entire grand jury testimony into the record. I write separately, however, because I believe the majority adopts an overly narrow construction of KRE 804(b)(3)'s exception for statements which "so far tend[ ] to subject the declarant to civil or criminal liability ... that a reasonable person in the declarant's position would not have made the statement unless believing it to be true."[1] The majority's analysis appears to suggest that only those statements which, standing alone, establish a prima facie case for a criminal offense against the declarant fall within the KRE 804(b)(3) "statements against penal interest" exception. I believe that KRE 804(b)(3) contemplates a broader exception to the hearsay rule.

Reid testified before the grand jury that: (1) he was present at the Davenport residence on the night their lives were taken; (2) he waited outside the Davenport residence and observed as Osborne eliminated the Davenport's security lights and illegally entered the home by break-

---

1. KRE 804(b)(3).

ing a window; (3) he repaired the chain on the motorbike upon which Osborne had driven them to the residence; (4) he heard gunshots and screams from inside the home; and (5) that he rode away from the scene on the motorbike with Osborne. The majority opinion emphasizes that mere presence at the scene where a crime is committed does not create liability and demonstrates that, if Reid were merely a bystander, as he claimed, he would have no liability for facilitation of the crimes.

The "statements against penal interest" exception in KRE 804(b)(3), however, is not limited to "confessions" or statements which, by themselves, demonstrate criminal liability. The Kentucky Evidence Rules Study Committee's commentary to KRE 804(b)(3) emphasizes that the rule "is widely construed to cover declarations which would have *probative value* against declarants in criminal prosecutions," [2] and Kentucky's leading evidence scholar, Robert Lawson, observes that "[s]tatements confessing to the commission of crimes are clearly against penal interests by any standard of measurement. *But self-incrimination need not be so absolute* in order for a statement *to qualify for admission under the exception.*" [3] In *United States v. Thomas,* [4] the Fifth Circuit Court of Appeals determined that the language of FRE 804(b)(3) embraces a class of statements broader than mere confessions:

The government argues that Weeks' statement was not against his penal interest because he did not expressly confess to the crime involved. We do not read Rule 804(b)(3) to be limited to direct confessions of guilt. Rather, by referring to statements that "tend" to subject the declarant to criminal liability, the Rule encompasses ... statements by a declarant that would have probative value in a trial against the declarant.[5]

Many of the statements Reid made in his grand jury testimony would unquestionably have had probative value in a trial against him. While the majority correctly observes that evidence of Reid's presence at the scene of the crime would not, by itself, *establish* his guilt of the crime, such an admission would be a valuable "piece of the puzzle" in a case against him. Likewise, although Reid's statements, standing alone, might not demonstrate all of the elements necessary to convict him of a criminal offense, they build a strong foundation. A prima facie case for facilitation against Reid lacks only one element—knowingly providing means or opportunity which aids the commission of the offense [6] —and the Commonwealth could establish through reasonable inferences that Reid acted as a "lookout" rather than the innocent bystander he claimed to be. If just one more ingredient is added to the pot—

2. KRE 804 (Kentucky Evidence Rules Study Committee Commentary) (emphasis added).

3. Robert G. Lawson, *Kentucky Evidence Law Handbook* (3rd Ed.) § 8.45 at 425 (Michie 1993) (emphasis added).

4. 571 F.2d 285 (5th Cir.1978).

5. *Id.* at 288. *See also United States v. Barrett,* 539 F.2d 244, 251 (1st Cir.1976):

Although the remarks did not amount to a clear confession to a crime ... we do not understand the hearsay exception to be limited to direct confession. A reasonable person would have realized that remarks of the sort attributed to Tilley [attributing involvement in the crime to one party and not another and thereby implying knowledge and involvement] strongly implied his personal participation in the ... crimes and hence would tend to subject him to criminal liability. Though by no means conclusive, the statement would be important evidence against Tilley were he himself on trial for the ... crimes.
*Id.*

6. *See* KRS 506.080(1).

culpable mental state [7]—the Commonwealth could prove complicity to murder and arson. In my opinion many of the statements Reid made during his testimony would tend to expose him to criminal liability, and I believe those statements came within the scope of KRE 804(b)(3).

I concur in the result reached by the majority because the lion's share of Reid's grand jury testimony does not fall within KRE 804(b)(3), and I agree with the other errors identified by the majority. Accordingly, I see no reason, at this time, to determine whether other evidence sufficiently corroborated those statements or to address Osborne's constitutional challenge to KRE 804(b)(3). I write separately merely to express my discomfort with the majority's narrow construction of the language of the KRE 804(b)(3) "statements against penal interest" exception.

GRAVES, J., joins.

