# IMPORTANT NOTICE
# <u>NOT TO BE PUBLISHED OPINION</u>

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED."
PURSUANT TO THE RULES OF CIVIL PROCEDURE
PROMULGATED BY THE SUPREME COURT, CR 76.28(4)(C),
THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE
CITED OR USED AS BINDING PRECEDENT IN ANY OTHER
CASE IN ANY COURT OF THIS STATE; HOWEVER,
UNPUBLISHED KENTUCKY APPELLATE DECISIONS,
RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR
CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED
OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE
BEFORE THE COURT.  OPINIONS CITED FOR CONSIDERATION
BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED
DECISION IN THE FILED DOCUMENT AND A COPY OF THE
ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE
DOCUMENT TO THE COURT AND ALL PARTIES TO THE
ACTION.

RENDERED: SEPTEMBER 27, 2018
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

**FINAL**

2017-SC-000327-MR

**DATE** 10|18|18 Kim Redmon, DC

BASS WEBB             APPELLANT

V.

ON APPEAL FROM MONTGOMERY CIRCUIT COURT
HONORABLE BETH LEWIS MAZE, JUDGE
NO. 10-CR-00062

COMMONWEALTH OF KENTUCKY            APPELLEE

## MEMORANDUM OPINION OF THE COURT

### AFFIRMING

On December 19, 2003, Sabrina Vaughn was murdered, and her body was buried under snow-covered ground to conceal the crime. In January 2010, a witness led law enforcement to the burial site and Vaughn's skeletal remains were unearthed. As a result of the investigation, Bass Webb was indicted by a Montgomery County grand jury in April 2010. Venue was changed to Rowan County and Webb was tried in April 2017.[1] The jury

---

[1] Although the exact reasons for this delay are unknown from the record, it should be noted that Webb had at least five other pending cases at this time that resulted in dismissals, jury trials, and guilty pleas. In Bourbon County, Webb was charged in 09-CR-00109 with Intimidating a Judicial Officer, which was dismissed in 2017; he was charged in 2009 in 09-CR-00109 with attempted murder and being a persistent felony offender (PFO), first-degree in 2009, with a jury trial and subsequent sentencing in 2014. In Fayette County, he had two more cases: 10-CR-00931

convicted Webb of intentional murder and tampering with physical evidence; the recommended sentence was life in prison. The circuit court imposed the recommended sentence. Webb now appeals as a matter of right.

## I. BACKGROUND

Vaughn and Webb were in a relationship. On December 19, 2003, they were with John French, Webb's first cousin, and Krista Bussell, French's girlfriend. The two couples were partying at French's home but decided that each couple needed "alone time." To facilitate this alone time, French and Bussell took Vaughn and Webb to Bussell's apartment and let them stay there. French and Bussell returned to French's home. Sometime over the next several hours, Webb choked and killed Vaughn.

Around 11:00 to 11:30 p.m. that evening, Webb called his brother, Claude Webb. Claude testified that Webb asked him to come to Bussell's apartment building and take him to French's home. Claude agreed; Claude stated that, when Webb got in the vehicle, Webb was not acting like himself and seemed agitated. Claude asked Webb where Sabrina was; Webb would not answer. Claude asked him a few more times where Sabrina was. Webb said that she was at the apartment, dead, and he admitted that he had "effing choked her." Claude testified he was not sure that Webb was telling the truth. He dropped him off at French's and they simply did not talk about the incident

---

(assault, third-degree, and PFO, first-degree), charged in 2010, ending in a jury trial and subsequent sentencing in 2011 and 11-CR-00428 (assault, third-degree and PFO, first-degree), charged in 2011, ending in jury trial and subsequent sentencing in 2013. Additionally, he was charged with murder in Pendleton County, 12-CR-00025, to which he entered a guilty plea in 2012 and was sentenced to fifty years in 2012.

anymore. When people started searching for Vaughn, he knew something had gone wrong.

Webb arrived at French's house and asked French to come speak with him. He told French that he had killed Vaughn and needed French to go back with him to the apartment. Webb told French that he had choked Vaughn, and then put his fists in her throat to make sure she was dead. French woke up Bussell, they both dressed, and all three drove over to Bussell's apartment. Bussell stayed in the vehicle at first and French and Webb went up to the apartment. French stated that Vaughn was lying in the middle of the floor, naked from the waist down, with only a t-shirt on. He tried CPR to resuscitate her but Webb said she had already been dead for an hour and there was no use. After about 10 to 15 minutes, Bussell came upstairs too. French and Webb decided they needed to get rid of Vaughn's body; Webb told French he did not want to give up his whole life in prison for Vaughn's death. French and Webb put Vaughn's body in the trunk of Bussell's car and they went back to French's home.

Bussell stayed at French's home while French and Webb took Vaughn's body to a remote location near French's brother's property. They had grabbed shovels and loaded Vaughn's body into a truck. At the property, they dug a shallow grave. French remembered that it took them several hours to dig the grave because the ground was frozen. Vaughn's t-shirt had come off in the drive and they placed it over her face before covering her body. They laid branches over the gravesite to conceal it and returned to Bussell's apartment.

3

French dropped off Webb and returned to his own home. According to French, they never spoke of the incident again.

In 2009 to 2010, both Claude and French were facing other legal issues and more expansive inquiry into their liability for Vaughn's death. It was only at this time that they related to law enforcement the narrative of events to which they testified at trial. French led law enforcement to the site where he and Webb had buried Vaughn. Police officers unearthed a human femur at the site; they then contacted forensic examiners to come to the crime scene. Most of Vaughn's skeletal remains were recovered and identified by comparison to the DNA of her daughter and sister. Some of the bones bore signs of having been scavenged by animals.

Claude, French, and Bussell all testified at Webb's trial. All three witnesses admitted that they failed to come forward with any of this information at the time of Vaughn's death. In fact, over six years passed after Vaughn's disappearance before any of the three witnesses spoke about Webb's involvement in Vaughn's death. Claude admitted that he was in serious legal trouble at the time he spoke to law enforcement with these details; he admitted that he was hoping it would help him secure favorable treatment in his own legal issues. French stated his change of mind came about because of his daughter's birth; however, he also admitted that he did not tell law enforcement about this version of events until he was being scrutinized for his own involvement in the crime. Bussell testified that French and Webb had told her that if she told anyone of the evening's events, that they would put her in

the ground next to Vaughn. Although law enforcement and forensic evidence witnesses testified at trial, the narrative of the events of Vaughn's death was only explained through the testimony of Claude, French, and Bussell.

## II. ANALYSIS

Webb now appeals his conviction, as a matter of right, on three grounds. First, he argues that Claude, French, and Bussell were so unreliable in their testimony that he should have been granted a directed verdict on all charges. Second, he alleges that the trial court erred in failing to instruct on reckless homicide as a lesser included offense. Third, and similarly, he also argues that the trial court erred in failing to instruct on manslaughter, first-degree, based on extreme emotional distress. We will address each argument in turn and relate additional facts as necessary.

### A. The circuit court did not err in denying Webb's motion for directed verdict.

Webb first argues that the trial court erred in failing to grant him a directed verdict on all charges. Webb's argument is premised on the supposition that Claude, French, and Bussell all had ulterior motives, based on protecting themselves, to blame Webb and make him a scapegoat for Vaughn's murder. As such, their testimony was so unreliable, according to Webb, that the evidence was unsubstantial and insufficient to support his conviction. He relies upon *Coney Island Co. v. Brown*, 162 S.W.2d 785 (Ky. 1942) for the assertion that witness testimony that is beyond belief cannot sustain a conviction and the defendant is entitled to a directed verdict of acquittal.

The standard for a directed verdict is clear:

5

> [T]he trial court must draw all fair and reasonable inferences from the evidence in favor of the Commonwealth. If the evidence is sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty, a directed verdict should not be given. For the purpose of ruling on the motion, the trial court must assume that the evidence for the Commonwealth is true, but reserving to the jury questions as to the credibility and weight to be given to such testimony.

*Commonwealth v. Benham*, 816 S.W.2d 186, 187 (Ky. 1991). On appellate review of the trial court's ruling on directed verdict, "the test ... is, if under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt, only then the defendant is entitled to a directed verdict of acquittal." *Id.* (citing *Commonwealth v. Sawhill*, 660 S.W.2d 3 (Ky. 1983)). "A reviewing court does not reevaluate the proof because its only function is to consider the decision of the trial judge in light of the proof presented." *Benham*, 816 S.W.2d at 187.

Webb cites to *Coney Island* to substantiate his argument. There, the Court was faced with a verdict in contradiction to the laws of nature. *See Coney Island Co.*, 162 S.W.2d at 787. The improbability of plaintiff's action "involv[ed] physical elements and scientific principles established by the laws of physics and mechanics and proven by unlimited experience always to produce the same result." *Id.* The Court still affirmed that it is "ordinarily the function of a jury to determine the weight and effectiveness of the evidence." *Id.* But, a jury is not permitted to "base its verdict upon a statement as to what occurred or how something happened when it is opposed to the laws of nature or is clearly in conflict with the scientific principles, or base its verdict upon testimony that is so incredible and improbable and contrary to common

6

observation and experience as to be manifestly without probative value." *Id.* at 788. It is this last statement that Webb argues provides him with the basis for directed verdict.

A jury's verdict cannot be based upon "incredible" and "improbable" testimony. However, Webb broadens the *Coney Island* exception beyond its intended use. In a much more recent case, this Court stated that "*Coney Island*, however, stands only for the proposition that an appellate court should revisit a trial court's directed verdict decision supported by testimony only when the testimony describes events that are *impossible.*" *Buster v. Commonwealth*, 381 S.W.3d 294, 303 (Ky. 2012) (emphasis added). "[W]hen a verdict depends on questions of a witness's credibility, rather than compliance with immutable laws of nature, *Coney Island*'s rule does not apply and a directed verdict is inappropriate." *Id.* (citing *Potts v. Commonwealth*, 172 S.W.3d 345, 350-51 (Ky. 2005)).

Here, Webb's argument is not that the witnesses testified as to events that are impossible, only that the witnesses were so biased as to be unreliable. This is clearly a matter of credibility for the jury to determine. "[T]he weight and value to be given to the evidence is for the jury to decide." *Sawhill*, 660 S.W.2d at 4. "The credibility and the weight to be given the testimony are questions for the jury exclusively." *Id.* at 5. Webb cross-examined each witness in question as to their biases, their motives in coming forward, their failure to say anything to law enforcement immediately after Vaughn was killed, and their legal difficulties leading them to speak to law enforcement now. Each witness was

7

heavily scrutinized and critiqued. It was a clear matter of credibility and weight for the jury to determine whether these witnesses were believable. Looking at the evidence in the light most favorable to the Commonwealth, and thus accepting the veracity of these witnesses' statements, a directed verdict was not warranted. It was not entirely unreasonable for the jurors to believe these witnesses and find Webb guilty. Therefore, the circuit court did not err in denying Webb's motion for directed verdict.

**B.      The circuit court did not err in the instruction of the jury.**

At trial, Webb argued that he was entitled to jury instructions on: intentional murder; wanton murder; manslaughter, second-degree; reckless homicide; manslaughter, first-degree (intent to harm but not kill); and manslaughter, first-degree (extreme emotional distress (EED)). The Commonwealth, although it is not perfectly clear, seemed to concede that Webb was entitled to instructions on intentional murder and wanton murder but argued there was no evidence presented that would warrant instruction on the other lesser-included offenses. The circuit court determined there was absolutely no evidence that Webb had exhibited EED in killing Vaughn and ruled that no instruction was warranted for manslaughter, first-degree under that definition. The court also determined that the proof was close enough to allow an instruction on manslaughter, second-degree, as a lesser-included offense of wanton murder but declined to instruct the jury on reckless homicide or manslaughter, first-degree (intent to harm but not kill). Webb

8

argues that the trial court erred in failing to instruct on reckless homicide and EED manslaughter, first-degree.

"A trial court's decision on whether to instruct the jury on a particular offense is necessarily based upon the evidence." *Holland v. Commonwealth*, 466 S.W.3d 493, 499 (Ky. 2015). Due to the "trial court's closer view of the evidence, we review questions concerning the propriety of giving a particular instruction for abuse of discretion." *Id.* (citing *Ratliff v. Commonwealth*, 194 S.W.3d 258, 274 (Ky. 2006)). "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Foley v. Commonwealth*, 425 S.W.3d 880, 886 (Ky. 2014) (citing *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999) (internal citations omitted)). In reviewing this error, there are two important facts from Webb's trial: one, Webb presented no evidence but rested his case after the prosecution rested and two, the jury was instructed on intentional murder, wanton murder, and manslaughter, second-degree but still found Webb guilty of the highest culpable state of mind, intentional murder.

### 1. Webb was not entitled to an instruction on reckless homicide.

A person is guilty of reckless homicide under Kentucky Revised Statute (KRS) 507.050(1) when he recklessly causes the death of another person. Recklessly is defined in KRS 501.020(4):

> A person acts recklessly with respect to a result or to a circumstance described by a statute defining an offense when he fails to perceive a substantial and unjustifiable risk that the result will occur or that the circumstance exists. The risk must be of such nature and degree that failure to perceive it constitutes a

9

gross deviation from the standard of care that a reasonable person would observe in the situation.

Under a straight reckless homicide theory,[2] "the defendant acts without the specific intent to kill and in doing so, fails to perceive a substantial and unjustifiable risk that his actions could cause the victim's death[.]" *Commonwealth v. Hasch,* 421 S.W.3d 349, 356 (Ky. 2013). "A reckless failure to perceive the risk that the defendant's actions would result in the victim's death supplies the element of recklessness[.]" *Id.* Thus, here, a finding of guilt for reckless homicide would require finding that Webb failed to perceive the substantial and unjustifiable risk in choking Vaughn and that this recklessness caused her death.

"An instruction on a lesser included offense is appropriate if, and only if, on the given evidence a reasonable juror could entertain a reasonable doubt of the defendant's guilt on the greater charge, but believe beyond a reasonable doubt that the defendant is guilty of the lesser offense." *Osborne v. Commonwealth,* 43 S.W.3d 234, 244 (Ky. 2001) (citing *Skinner v. Commonwealth,* 864 S.W.2d 290, 298 (Ky. 1993) and *Luttrell v. Commonwealth,* 554 S.W.2d 75, 78 (Ky. 1977)). An absence of proof on the charged crime does not entitle a defendant to an instruction on a lesser-included offense. Instead, there must also be the finding that a reasonable juror could find guilt beyond a reasonable doubt of the lesser offense. On appellate review, the reviewing court "ask[s] ... whether a reasonable juror could acquit of the greater charge but

---

[2] A defendant may also be found guilty of reckless homicide under the imperfect self-defense theory. *See Hasch,* 421 S.W.3d at 356. However, Webb did not claim self-defense in any way, so that particular instruction is irrelevant to our analysis.

10

convict of the lesser." *Allen v. Commonwealth*, 338 S.W.3d 252, 255 (Ky. 2011) (citing *Thomas v. Commonwealth*, 170 S.W.3d 343 (Ky. 2005), *Osborne*, 43 S.W.3d 234, and *Commonwealth v. Wolford*, 4 S.W.3d 534 (Ky. 1999)). "[W]hile a defendant is entitled to jury instructions embodying defenses reasonably suggested by the evidence, he is not entitled to instructions for which there is no evidentiary support." *Allen*, 338 S.W.3d at 257.

While the jury is entitled to simply not believe the testimony at trial, the jury is *not* entitled to fabricate a speculative explanation, with no evidentiary basis, to determine what happened. As Justice Stephenson stated in his dissent in *Luttrell*, "[w]e are not in the business of conjuring up speculative inferences to give a jury the opportunity to reduce the penalty for a criminal act." *Luttrell*, 554 S.W.2d at 80 (Stephenson, J., dissenting). "Why should we read possible exculpatory reasons into a scenario ... ?" *Id.* The jury should not be instructed on what can only be described as a speculative scenario; instead, if there is *evidence* to the jury from which it could reasonably infer guilt of a lesser crime, then the defendant is entitled to that instruction.

In *Hasch*, this Court determined that "[n]o rational juror could believe that [defendant] *failed to perceive the risk* of death inherent in her conduct of firing a pistol, with or without her eyes closed, in the direction of another person at such close range." *Hasch*, 421 S.W.3d at 357 (emphasis original). The Court cited to *Hudson v. Commonwealth*, in which it was determined that "[d]efendant could not reasonably have failed to perceive the risk of death associated with taking a police informant/victim to a remote area in the dark of

11

night to meet criminal gang members angry about her cooperation with police."
*Id.* at 357-58 (citing *Hudson v. Commonwealth*, 385 S.W.3d 411, 418-19 (Ky. 2012)).

Similarly here, no rational juror could determine from the evidence presented at trial that Webb could possibly have failed to perceive the risk in strangling and choking Vaughn.[3] Strangulation is inherently an intentional act. While other evidence could potentially raise the possibility of instructions on lesser-included offenses in such a situation, no other evidence here was presented. The only narrative the jurors heard was that Webb admitted to his cousin and brother that he had choked or strangled Vaughn. They heard evidence that he intentionally, with assistance from his cousin, hid the evidence of his crimes. While Webb attempts to explain that his entire demeanor that evening showed a sense of recklessness, this is nothing but utter conjecture. It must be the killing act that was done with recklessness and there was no evidence from which the jury could reasonably determine that state of mind. Webb cites to *Commonwealth v. Wolford* to support his claim that he was entitled to the instruction. However, *Wolford* was a very unique case. "[S]hots were heard and the victims were found dead from gunshot wounds. The evidence against the various defendants was entirely circumstantial." *Osborne*, 43 S.W.3d at 244 (citing *Wolford*, 4 S.W.3d at 539-40). Here, the evidence was circumstantial, in part, but also based on

---

[3] *See also People v. Leach*, 939 N.E.2d 537, 551 (Ill. App. Ct. 2010) ("[D]efendant knowingly placed his hands on [victim's] neck and exerted sufficient force to first render her unconscious and eventually dead. Clearly, the requisite mental state of knowledge could be inferred from the very nature of defendant's voluntary acts.").

witnesses' testimony of what Webb told them about what had happened. He is the one that, if the witnesses were believed, stated that he had choked Vaughn and she had died as a result.

It was entirely possible that a reasonable juror could have found the witnesses for the Commonwealth biased and unbelievable. However, in that case, the correct option would have been acquittal. The defense theory of the case was that these witnesses were lying about Webb to protect themselves from legal liability or gain favorable treatment in other legal matters. This is a plausible defense; however, none of the evidence given at trial goes toward the questioning of Webb's state of mind at the time of Vaughn's death. Given the testimony at trial, there was no evidence presented that would substantiate a reckless homicide conviction. As such, no rational juror would have been able to find guilt under such an instruction. The trial court was clearly within its proper discretion in denying the instruction on reckless homicide.

## 2. Webb was not entitled to an instruction on extreme emotional distress.

"Extreme emotional distress is a temporary state of mind so enraged, inflamed, or disturbed as to overcome one's judgment, and to cause one to act uncontrollably from the impelling force of the extreme emotional disturbance rather than from evil or malicious purposes." *McClellan v. Commonwealth*, 715 S.W.2d 464, 468-69 (Ky. 1986). The "emotional state does not constitute an extreme emotional disturbance unless there is a reasonable explanation or excuse therefor, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under circumstances as

13

defendant believed them to be." *Id.* at 469. "To support a manslaughter instruction based upon extreme emotional disturbance, the evidence must have been such that it could induce a reasonable jury to believe that Appellant acted violently because of" this described state of mind. *Holland v. Commonwealth*, 466 S.W.3d 493, 503 (Ky. 2015) (citing *McClellan*, 715 S.W.2d at 468-69).

"It is well-settled that to qualify for an instruction on EED, there must be evidence of an 'event that trigger[ed] the explosion of violence on the part of the criminal defendant' and that event must be 'sudden and uninterrupted.'" *Holland*, 466 S.W.3d at 504 (quoting *Foster v. Commonwealth*, 827 S.W.2d 670, 678 (Ky. 1991), *cert. denied*, 506 U.S. 921 (1992)). In *Holland*, the defendant "did not testify, and so he provided no direct evidence to explain his state-of-mind or to identify a source of his extreme emotional disturbance, if in fact, he suffered such a disturbance." *Holland*, 466 S.W.3d at 504-05. There was some evidence of an ongoing feud between defendant and victim, but nothing more of any triggering event or disturbed mindset. *Id.* at 505. "A jury could not find that [defendant] acted as the result of an extreme emotional disturbance except by resorting to sheer speculation." *Id.*

As in *Holland*, the evidence at Webb's trial was entirely devoid of any proof of an extreme emotional disturbance. Webb did not testify; he did not have an expert witness testify. There was no evidence as to what happened that evening other than Webb's statements to French and Claude that he "choked" Vaughn. Without proof of some triggering event to cause an

14

emotional disturbance, there was absolutely no ground for providing the jury with an EED instruction. The only way the jury could have determined Webb was under EED when he killed Vaughn was through "sheer speculation." The trial court was well within its discretion to deny Webb's request.

## III.   CONCLUSION

The trial court properly denied Webb's motion for directed verdict. The evidence before the jury presented issues of witness credibility and was properly left to the jury's province to decide. The trial court also properly instructed the jury on the law of the case for its deliberations. For the foregoing reasons, we affirm the judgment of the Montgomery Circuit Court.

Minton, C.J.; Hughes, Keller, VanMeter, Venters and Wright, JJ., concur. Cunningham, J., not sitting.

COUNSEL FOR APPELLANT:

Emily Holt Rhorer
Department of Public Advocacy

COUNSEL FOR APPELLEE:

Andy Beshear
Attorney General of Kentucky

Perry Thomas Ryan
Assistant Attorney General